[Cite as *State v. Kalka*, 2018-Ohio-5030.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106339**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**NIKOLAY KALKA**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-615264-A

**BEFORE:** Laster Mays, J., E.A. Gallagher, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** December 13, 2018

-i-

**ATTORNEYS FOR APPELLANT**

Michael A. Partlow
112 South Water Street, Suite C
Kent, Ohio 44240

Sarah Thomas Kovoor
Ford, Gold, Kovoor & Simon Law Group
8872 East Market Street
Warren, Ohio 44484


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By:    Jennifer A. Driscoll
          Daniel T. Van
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


ANITA LASTER MAYS, J.:

{¶1}  Appellant Nikolay Kalka ("Kalka") appeals the jury verdict finding him guilty of two counts of gross sexual imposition, R.C. 2907.05(A)(4), and one count of kidnapping for the purpose of engaging in sexual activity, R.C. 2905.01(A)(4).  With the merger of the kidnapping and gross sexual imposition counts, the state proceeded with sentencing on the gross sexual imposition counts.  Kalka was sentenced to five years of imprisonment on Counts 1 and 2 to be served concurrently.  We affirm.

I.    **Background and Facts**

{¶2}  The trial in this case commenced in May 2017.  An interpreter was provided for

75-year-old Kalka whose native language is Ukrainian.

{¶3} Ten-year-old friends EM and MM were at a public recreation swimming facility that contained several interconnected water features including an adult pool area, kiddie pool, lazy water river feature, large and small water slides, therapeutic waterfall, and a small open-ended whirlpool area that created a vortex-type water current. EM and MM testified that Kalka was sitting in the whirlpool where the girls were playing. Kalka said hello to them and they responded because he seemed friendly, and they continued playing.

{¶4} MM testified that, as they were getting out of the whirlpool, Kalka "grabbed me and EM at the same time. I got away, then I pulled EM out of the whirlpool." (Tr. 234.) MM admitted that the trial testimony was the first time she stated that Kalka touched her at the whirlpool because she "thought he was goofing around" and "didn't know it was part of what happened." (Tr. 253.)

{¶5} MM helped EM exit the whirlpool and they played in the lazy river feature and then went to the kiddie pool area. EM testified that Kalka followed the girls to the kiddie pool and pulled EM under the therapeutic waterfall[1] that he was sitting under when they moved past him to get to the water slide. EM said Kalka was touching her breast area and squeezing her vaginal area and later that Kalka was rubbing her chest and vaginal area and "he kept on changing spots." (Tr. 225.) EM said that she was unable to escape Kalka's grasp until MM helped her pull away. They told the lifeguard and MM's grandmother.

{¶6} EM and MM reviewed a rather grainy video recording of the events compiled from the pool's multiple security cameras that provided shifting views of the areas. The video did not

---

[1] The therapeutic waterfall "pours down water really hard, like a back massage." (Tr. 235-236.) The water pressure is adjustable and could also be turned off. (Tr. 241.)

support their testimony that Kalka "pulled them" at the whirlpool but EM stated that it "felt like" Kalka pulled her. (Tr. 207.) The video depicted Kalka remaining in the whirlpool area and splashing at the girls while the girls swam toward the lazy river feature. The video shows that Kalka exited the whirlpool and went directly to the therapeutic waterfall.

{¶7} The girls later returned to the whirlpool and then moved in Kalka's direction who was still sitting under the waterfall. As EM reaches Kalka, he grabs EM as though trying to pull her under the waterfall. Kalka is holding EM and "dunking her under" the waterfall. (Tr. 258.) MM stated she tried to pull EM away, then MM stated that she moved a few feet away to turn off the water "that was coming down [from the waterfall] so I could see what was going on, and I tried to pull her [EM], but I pulled so hard to where I fell over. "He was squeezing her over her vagina. And I went to tell the lifeguard and the guy left." (Tr. 231.) The video shows MM approaching the lifeguard, EM disengaging herself, and EM also moving toward the lifeguard.

{¶8} Together, EM and MM wrote a statement for the police. The statement said that they were talking to "this guy with an accent" who was "pulling [EM] up to his chest" and "he was being socially awkward," defined by EM as "a little weird to me." (Tr. 214.) EM also said that she thought Kalka was friendly and that when Kalka grabbed her he was trying to pull her under the waterfall. EM felt uncomfortable because he began touching her.

{¶9} During redirect, the state attributed the absence of video evidence depicting Kalka pulling the girls at the whirlpool to the fact that the views were comprised of various angles recorded by several security cameras.

{¶10} The lifeguard on duty noticed the girls and Kalka communicating and splashing each other in the whirlpool and they seemed to be enjoying themselves. The lifeguard saw no cause for concern. Kalka moved to the kiddie area to sit under the therapeutic waterfall where

"it's common for elderly men to sit under there because it feels good on their back and shoulders." (Tr. 276.)

{¶11} Later, the lifeguard's "attention was drawn to the children moving over back to the elderly man's area [under the waterfall]. They [Kalka and the girls] began to splash and so forth, so that drew my attention." (Tr. 276.) The splashing and conversation stopped when Kalka grabbed one of the girls by the waist and "brought one of the girls onto his lap." (Tr. 277.)

{¶12} Describing the waterfall encounter on the video, the lifeguard stated:

> The child could not necessarily get out. From where I was standing, she did not seem to have fun. She no longer had a smile on her face. She wasn't laughing as she was prior. * * * So I looked at the child. She looked at me. She broke free and ran over to myself. She explained the situation to me. I then told her, okay, do not go over there. I will get my supervisor.

(Tr. 279-280.) The girl told the lifeguard that Kalka "touched [her] in her vagina and breast area." (Tr. 283.)

{¶13} During cross-examination, the lifeguard acknowledged that he could only see what was going on above the water and could not actually see Kalka's legs. He did not hear the girls calling for help and did not mention in his report to police that the girls' faces during the waterfall encounter expressed to him a "stunned look for help." (Tr. 287.) He was advised of the potential issue when the girls approached him.

{¶14} Officer Valukievic of the Middleburg Heights Police Department interviewed the girls at the recreation center who appeared to be shaken. The girls' mothers and MM's grandmother were present. The state was unable to have the officer review a police report because he was not the author.

**{¶15}** The state rested. Kalka's Crim.R. 29 motion for judgment of acquittal was denied on the grounds that the question of sexual motivation should be decided by a jury.

**{¶16}** The defense presented several witnesses to testify on Kalka's behalf. Roman Skalsky ("Skalsky") met Kalka in 1990 in communist-ruled Ukraine where Kalka founded and pastored a Christian church. Skalsky also knows Kalka's wife, children, and grandchildren. Skalsky testified about Kalka's benevolent work in the community and support and advice to others.

**{¶17}** Yaroslav Boyechko ("Boyechko"), originally from the Ukraine, is the senior pastor of a Pentecostal church in Kentucky. Boyechko has known Kalka since 1970 when his family began attending Kalka's church. The two always communicate in their native language and Boyechko did not know that Kalka spoke English. Boyechko opined that Kalka is a "[v]ery good man" who he is proud to have as a friend. (Tr. 314.)

**{¶18}** The families of Jerry Romasco ("Romasco") and Kalka migrated to the Ukraine in 1990 and became friends. Romasco said that "I respect and adore him." (Tr. 319.) Romasco is close friends with two of Kalka's sons. Communications were always in Ukrainian and many elderly Ukrainians do not speak English.

**{¶19}** Kalka testified with the use of an interpreter. Kalka stated that he was at the "cold jacuzzi" standing by the water streams to massage his back. (Tr. 331.) One girl splashed him, he splashed back, and they both began pouring water on him. This continued shortly, then he left the whirlpool and went to the waterfall, and the girls approached.

> Kalka: So I wanted to kind of show them what it was like to get splashed all the time, so I wanted to pick [EM] up and put her up by the fountain where the water was pouring. And I took her by the hand and I was pulling her and my point was to get her under the fountain so she would know what it felt like.

And then I pulled her toward this fountain so that it would pour on her. I didn't grab her or touch her anywhere near her breast. It wouldn't have even come into my mind to touch her there. I lived 70 years and I've never had this kind of accusation against me. It couldn't have even come to my mind to do such a thing. It would never occur to me. I've lived my life in a certain way. I've been a pastor.

(Tr. 331-333.) Kalka stated he never intentionally touched EM in the vaginal or breast area.

{¶20} During cross-examination, Kalka maintained that he was playing with the girls as he does his grandchildren. He maintained that he was playfully pulling EM to the waterfall and that she may have fallen on his lap because she was slippery. "It wasn't on my knees. I was just pulling her to get under the fountain. I didn't have her on my knees at all." (Tr. 335.)

{¶21} Kalka's Crim.R. 29 motion for judgment of acquittal was again denied. Jury found him guilty on both counts. Kalka timely appeal the convictions.

## II. Assignments of Error and Analysis

{¶22} Kalka's first two assigned errors challenge the sufficiency of the evidence and the manifest-weight of the evidence. Kalka's third assigned error charges that counsel was ineffective because:

Counsel permitted an individual to serve on the jury that was an attorney, was personally familiar with both trial counsel and counsel for the prosecution, had previously been a prosecutor in [sic] served as boss for the prosecutor in the case and the juror did not feel, as a result of these factors, that he should sit on the jury; and

[T]he record reveals that counsel failed to argue that two separate and distinct counts of gross sexual imposition should be merged for sentencing purposes and the facts of the case clearly reveal that the counts did not involve separate harm, a separate animus or a separate motivation.

Appellant's brief, p. iv.

### A. Sufficiency and Manifest-Weight of the Evidence

{¶23} We combine the related first and second assigned errors for response. A challenge to the sufficiency of the evidence questions whether the state met its burden of production. A manifest-weight challenge asks whether the state met its burden of persuasion.

{¶24} "'A claim that a conviction is unsupported by sufficient evidence tests whether the state has met its burden of production at trial.'" *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 32, quoting *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20.

{¶25} The question is not whether the prosecution's evidence "is to be believed, but whether, if believed, the evidence admitted at trial supported the conviction." *Rudd* at ¶ 32, citing *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375. The court must view the evidence in a light most favorable to the prosecution and determine whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶26} In entertaining a manifest-weight challenge, we sit as a thirteenth juror and intercede only where it is apparent that "a jury has 'lost its way.'" *State v. Stewart*, 8th Dist. Cuyahoga No. 86411, 2006-Ohio-813, ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The weight-of-the-evidence standard "'addresses the evidence's effect of inducing belief.'" *Rudd* at ¶ 61, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264.

## 1. Gross Sexual Imposition

{¶27}    Kalka was charged with two counts of gross sexual imposition pursuant to R.C. 2905.07(A)(4):

> (A)   No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
>   *    *    *
>
> (4)   The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶28} "Sexual contact" is defined as

> [A]ny touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

{¶29} The charges included a sexual motivation specification pursuant to R.C. 2941.147(B):

> (A) Whenever a person is charged with an offense that is a violation of section 2903.01, 2903.02, 2903.11, or 2905.01 of the Revised Code, a violation of division (A) of section 2903.04 of the Revised Code, an attempt to violate or complicity in violating section 2903.01, 2903.02, 2903.11 or 2905.01 of the Revised Code when the attempt or complicity is a felony, or an attempt to violate or complicity in violating division (A) of section 2903.04 of the Revised Code when the attempt or complicity is a felony, the indictment, count in the indictment, information, or complaint charging the offense may include a specification that the person committed the offense with a sexual motivation. * * *
>
> (B) As used in this section, "sexual motivation" has the same meaning as in section 2971.01 of the Revised Code.

"[A] sexual motivation specification requires the state to show that the underlying offense was committed with 'a purpose to gratify the sexual needs or desires of the offender.'" *State v. Dove*, 8th Dist. Cuyahoga No. 101809, 2015-Ohio-2761, ¶ 38, quoting R.C. 2941.147.

**{¶30}** This court has held that "[s]exual contact, an element of gross sexual imposition, means any nonconsensual physical touching, even through clothing, of the body of another. *State v. Ackley*, 120 Ohio Misc.2d 60, 2002-Ohio-6002, 778 N.E.2d 676." *State v. Jones*, 8th Dist. Cuyahoga No. 87411, 2006-Ohio-5249, ¶ 15.

**{¶31}** Kalka argues that the convictions must be reversed because the state failed to prove sexual motivation. Proof of a sexual gratification purpose does not require direct evidence of arousal or gratification. A "trier of fact may infer that a defendant was motivated by a desire for sexual arousal or gratification from the totality of the circumstances." *State v. Edwards*, 8th Dist. Cuyahoga No. 81351, 2003-Ohio-998, ¶ 22, citing *State v. Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926.

**{¶32}** Kalka states that inconsistencies between the testimony of EM and MM should weigh heavily against the conviction but that is not necessarily the case. Inconsistencies in testimony do not translate into entitlement to have a conviction reversed as against the sufficiency or manifest-weight of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 37.

**{¶33}** EM and MM testified that, while Kalka was sitting under the waterfall, he grabbed EM and would not let her go. MM turned the water off and observed that Kalka was touching EM in the breast and vaginal areas. EM testified that Kalka was squeezing and pinching her in the breast and vaginal areas.

**{¶34}** The lifeguard observed EM, MM, and Kalka splashing each other in the whirlpool and did not observe any behaviors of concern. However, that was not the case when the encounter under the waterfall took place. The lifeguard stated that EM made eye contact with him and looked distressed. "As lifeguards, we are trained to see different faces for

drowning victim purposes." (Tr. 286.) "So we're trained to see if you have really, really wide eyes and like you have almost like a pale face * * * that's like a big red flag to us." (Tr. 286-287.) "[T]hat did kind of trigger I need help." (Tr. 287.)

{¶35} The video depicts Kalka sitting under the waterfall and subsequently appears to be holding EM. Kalka's back is to the camera and a frontal view of the activities cannot be observed during the encounter with EM. MM can also be seen turning off the water supply to the waterfall, as she testified, as well as leaving and returning to the scene. MM stated that she notified the lifeguard and returned to the scene.

{¶36} EM went directly to the lifeguard after pulling away from Kalka and reported that Kalka touched her in the breast and vaginal areas as the lifeguard testified. The lifeguard said that EM was upset, unhappy, and her demeanor was one of disbelief of what had just transpired.

{¶37} The evidence demonstrates that Kalka grabbed EM, held her against her will and moved his hands over her breast and vaginal areas. Viewing this evidence in a light most favorable to the state, we find that the "record demonstrates * * * [that] a rational trier of fact could conclude beyond a reasonable doubt" that the evidence is sufficient to find that Kalka restrained EM with a sexual purpose. *Dove*, 8th Dist. Cuyahoga No. 101809, 2015-Ohio-2761, at ¶ 39; *see also State v. Gilliam*, 9th Dist. Lorain No. 97CA006757, 1998 Ohio App. LEXIS 3668 (Aug. 12, 1998).

{¶38} We further find that, viewed from the perspective of a "thirteenth juror," we cannot say that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541,

citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), and quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

### 2. Kidnapping

**{¶39}** R.C. 2905.01(A)(4) kidnapping provides:

(A) No person, in the case of a victim under the age of thirteen, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

**{¶40}** This court has previously explained that

Ohio law is clear that "[a]n offense under R.C. 2905.01 does not depend on the manner in which an individual is restrained. * * * Rather, it depends on whether the restraint 'is such as to place the victim in the offender's power and beyond immediate help, even though temporarily.' * * * The restraint 'need not be actual confinement, but may be merely compelling the victim to stay where he is.'" *State v. Mosley*, 178 Ohio App.3d 631, 2008-Ohio-5483, 899 N.E.2d 1021, citing *State v. Wilson*, 10th Dist. Franklin No. 99AP-1259, 2000 Ohio App. LEXIS 5057 (Nov. 2, 2000).

*State v. Wright*, 8th Dist. Cuyahoga No. 92344, 2009-Ohio-5229, ¶ 24.

**{¶41}** As stated previously in our analysis, a sexual motivation specification "requires that the state show that the underlying offense was committed with 'a purpose to gratify the sexual needs or desires of the offender.'" *Dove*, 8th Dist. Cuyahoga No. 101809, 2015-Ohio-2761, at ¶ 38, quoting R.C. 2941.147.

**{¶42}** In this case, the underlying offense is kidnapping, and the question is whether Kalka's restraint of EM was for the purpose of engaging in sexual activity against the victim's will. We find that it was.

**{¶43}** "R.C. 2905.01(A)(4) requires only that the restraint or removal occur for the purpose of non-consensual sexual activity." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 196; *Dove* at ¶ 37. "[T]he kidnapping statute punishes certain removal or restraint done with a certain purpose." *State v. Cope*, 12th Dist. Butler No. CA2009-11-285, 2010-Ohio-6430, ¶ 68; R.C. 2941.147.

**{¶44}** EM and MM testified that Kalka grabbed and held EM while touching her breasts and vaginal area. EM stated that Kalka refused her repeated requests to let her go. MM testified that she pulled EM to release her from Kalka's grasp but could not and that she also requested that Kalka release EM. The testimony of the lifeguard supports the girls' testimony as well as the period of time that Kalka may be observed holding onto EM in the video.

**{¶45}** Viewed in a light most favorable to the prosecution, we cannot say that the evidence was insufficient to support the conviction or that the trier of fact in this case truly lost its way. Based on our review of the entire record, Kalka's claim that the verdict was not supported by the sufficiency or weight of the evidence fails.

**{¶46}** Kalka's first and second assignments of error are overrruled.

**B.      Ineffective Assistance of Counsel**

**{¶47}** Kalka's third and final assigned error asserts that Kalka was denied the effective assistance of counsel. We disagree.

**{¶48}** To substantiate a claim of ineffective assistance of counsel, Kalka must show that: (1) "counsel's performance was deficient, and [(2)] the deficient performance prejudiced the defendant so as to deprive him of a fair trial." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Judicial scrutiny of defense counsel's performance must be

highly deferential." *Strickland* at 694. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

### 1. Juror

{¶49} First, Kalka charges that counsel was ineffective for allowing an attorney to serve on the jury who: (1) was formerly a prosecutor who supervised the prosecutor in the instant case, (2) was personally familiar with both counsel, and (3) expressed a personal belief that he should not sit on the jury.

{¶50} We do observe that during jury selection, the juror's tenure with the prosecutor's office was disclosed. The juror worked as an assistant county prosecutor in the economic crimes unit handling white collar crimes from 1986 to 1991. The juror left the prosecutor's office to serve with the Bureau of Workers' Compensation and later returned to the prosecutor's office to serve as an administrator from 2000 to 2007. During his administrative tenure, the juror worked primarily on civil matters and possibly one or two criminal cases.

{¶51} The juror also disclosed that he was formerly the supervisor of the state's trial counsel and that, while they had a good relationship, that "would have no bearing on my obligation [to be fair and impartial]." (Tr. 103.)

{¶52} The juror assured the trial court that he would be a fair and impartial juror and that he could effectively interpret the evidence from the perspective of a nonattorney.

> Juror No. 8: Because I do understand the gravity of what's happening here. And I — you know, I've done criminal defense before. I've done prosecution before. And I did private practice from, like, 1991 through 2000, including criminal defense work, and so I understand the difficulties of making some of these determinations and that's the reason why. And that's the reason why to both questions, yes, I could — if I was sitting there, I would be comfortable with me serving as a juror, and,

two, in answer to your other question, do you want to be on this
jury, the answer is no.

(Tr. 102-103.)

**{¶53}** Kalka has failed to point to any evidence demonstrating that counsel's performance was deficient and that he was prejudiced as a result of the juror's presence on the jury. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 98, citing *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. The record reveals that the juror made full disclosure of his employment, abilities, and his desire not to sit as a juror. An appellate court "will ordinarily refrain from second-guessing strategic decisions counsel makes at trial." *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 151.

### 2. Merger

**{¶54}** Kalka argues here that his counsel's failure to argue that the two counts of gross sexual imposition should be merged for sentencing purposes also constituted ineffective assistance. Kalka offers that the facts of the case clearly reveal that the counts did not involve separate harm, a separate animus, or a separate motivation.

**{¶55}** "The reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25.

> In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance — in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.

*Id*.

**{¶56}** In the instant case, one count of gross sexual imposition was relating to the touching of the victim's breasts, and the second count was for touching the vaginal area. These acts do not merge.

> [D]ifferent sexual acts occurring in the same encounter are not allied offenses of similar import. *State v. Jones*, 5th Dist. Licking No. 09-CA-95, 2010-Ohio-2243 (unlawful sexual conduct with a minor by digital penetration and cunnilingus were not allied offenses of similar import when committed in a short time span); *State v. Waters*, 5th Dist. Ashland No. 03-COA-002, 2003-Ohio-4624 (finding that unlawful sexual conduct with a minor by vaginal intercourse and/or digital penetration and fellatio or cunnilingus were not allied offenses of similar import); *see also State v. Brown*, 3rd Dist. Marion No. 9-09-15, 2009-Ohio-5428; and *State v. Ludwick*, 11th Dist. Ashtabula No. 2002-A-0024, 2004-Ohio-1152.

*State v. Daniels*, 5th Dist. Tuscarawas No. 10AP070023, 2011-Ohio-4899, ¶ 39. "'Each act was a separate and distinct offense. Each act violated a different area of the victim's body.'" *State v. Bascomb,* 8th Dist. Cuyahoga No. 46073, 1983 Ohio App. LEXIS 13711, 3 (Aug. 18, 1983), quoting *State v. Barnes,* 68 Ohio St.2d 13, 427 N.E.2d 517 (1981).

**{¶57}** The gross sexual imposition counts in this case do not merge. Defense counsel was not ineffective for failing to object.

**{¶58}** Kalka's third and fourth assignments of error are therefore overruled.

### III.  Conclusion

**{¶59}**  The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, A.J., and
MARY J. BOYLE, J., CONCUR