[Cite as *State v. Stites*, 2020-Ohio-4281.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-190247 |
| | | C-190255 |
| Plaintiff-Appellee, | : | TRIAL NO. B-1803242-B |
| vs. | : | |
| ANGELA STITES, | : | *O P I N I O N.* |
| Defendant-Appellant. | : | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: September 2, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Angela Glaser* for Defendant-Appellant.

**WINKLER, Judge.**

{¶1}    Defendant-appellant Angela Stites appeals her convictions for complicity to sexual battery, complicity to rape, rape, gross sexual imposition, and endangering children, for which the trial court sentenced her to 86 years in prison. Stites's convictions stem from evidence that she and her longtime partner, Herman See, sexually abused their daughters and stepdaughters over a period of 16 years. For the reasons that follow, we determine that the evidence presented at trial was insufficient to sustain Stites's conviction for rape as alleged in Count 27 of the indictment. As to Stites's remaining convictions, we overrule Stites's assignments of error and affirm the trial court's judgment.

## Factual Background

{¶2}    Stites developed a relationship with Herman See in 1998. At the time the two started their relationship, Stites had a daughter from a previous relationship, E.M, and See had two children from his previous relationships, a son, Robert See, and a daughter, S.J.S. Stites and See then had biological children together: two girls, K.S. and W.S., and a boy. The blended family lived together in Colerain Township and Norwood until November of 2017 when the Norwood Police Department initiated an investigation into allegations that See had been raping his daughter, K.S. K.S.'s allegations led to a broader investigation of sexual abuse by See and Stites as well. As a result of the investigation, the state indicted See and Stites with a litany of charges regarding not only K.S., but also K.S.'s two, older half-sisters, E.M. and S.J.S. The matter proceeded to a jury trial in which See and Stites were tried together.

{¶3}    At trial, K.S. recalled that the abuse by her father had begun sometime around the age of six when they lived in Colerain Township. K.S. recalled a specific

incident where she had performed fellatio on her father, and her father had performed cunnilingus on her. K.S. remembered a time where See had made her wear her mother's green lingerie, and that See had used various sex toys on her. K.S. recalled that See had performed cunnilingus on her the day of her seventh birthday party in April of 2006.

{¶4} According to K.S., Stites knew about the sexual abuse, because Stites "walked in" on See and K.S. engaged in sexual activity when K.S. was ten or 11 years old. Stites would also "start fights" with K.S. and See on the days when Stites found out about their sexual activities. K.S. further testified that she had overheard conversations between See and Stites in which the two discussed See's sexual activities with K.S.

{¶5} The summer before K.S. started the sixth grade, sometime between June 2010 and July 2010, K.S. recalled that See actually penetrated her with his penis. K.S. remembered that the penetration had occurred on a white leather couch. K.S. estimated that her father had sexual intercourse with her over 200 times after that time. K.S. also recalled that when she had started dating her boyfriend, sometime in December 2012, her father had sex with her.

{¶6} In April 2015, K.S., then 15, gave birth to a baby girl, and K.S.'s doctor advised her to abstain from intercourse for a period of time. K.S. recalled that her father had sex with her when her doctor permitted her to have sex again. K.S. also recalled that her father had sex with her on her baby's first Christmas Eve.

{¶7} In 2017, K.S. moved in with the father of her baby. Before she moved, Stites asked K.S. how she felt about her father taking her virginity. K.S. said that it was not until she told her boyfriend about the abuse that she realized what she had

experienced amounted to sexual abuse. Her boyfriend encouraged her to go to the Norwood police.

{¶8} K.S.'s older stepsister, E.M. testified at trial regarding her abuse. E.M. primarily resided with her biological father, Stites's ex-husband, but E.M. visited the See home regularly. E.M. testified that she recalled the abuse beginning around the age of three or four. E.M. recalled See had inserted his fingers in her vagina and had licked her vaginal area. E.M. also recalled a time around her fifth birthday where See had made her perform oral sex on him. E.M. remembered S.J.S had been there as well. After this incident, E.M. testified that the sexual abuse occurred regularly at the See home.

{¶9} In late 2010, when E.M. was 14, See told her that he had heard she was no longer a virgin. When E.M. responded in the affirmative, See had vaginal intercourse with her. By E.M.'s estimate, See had sex with her between 20 and 50 times.

{¶10} According to E.M., Stites knew about the abuse as well. Stites told E.M. that if she did not allow See to have sex with her, then she would never know a "real man's love." E.M. also recalled a time in elementary school when Stites had demonstrated oral sex by using a popsicle.

{¶11} E.M. testified that she could clearly recall the last time See had sex with her: On January 1, 2012, E.M.'s friend had died the night before in a car accident, and See had sex with her to "cheer her up." E.M. then disclosed the abuse to her biological father. Her father reported E.M.'s allegations to the Norwood police. An investigation ensued, but the grand jury did not return an indictment. E.M. testified that she had begun abusing drugs and her life spiraled out of control. At the time of trial, E.M. was incarcerated.

{**¶12**} E.M.'s stepsister, S.J.S., the biological daughter of See and See's ex-wife, Dawn, also testified at trial regarding her abuse. S.J.S. testified that See and Stites first abused her in 2001, when S.J.S. was eight years old. S.J.S. lived with her mother at the time in Florida, but she came to Ohio to stay with her father for the summer. One night, See came into S.J.S.'s bedroom and asked her if she wanted a blue lollipop. S.J.S. said yes, and See told her that she could have it if she "gave him oral sex." S.J.S. and See walked to the family room and S.J.S. performed fellatio on him. E.M. walked into the room during the encounter, and then E.M. also performed fellatio on him. S.J.S. testified that See had tried to have sex with her, but he stopped when S.J.S. told him it hurt. S.J.S. testified that Stites had been present during the encounter, that Stites had licked her vagina, and that S.J.S. had licked Stites's vagina. See and Stites also encouraged S.J.S. and E.M. to put their fingers in each other's vaginas.

{**¶13**} At the end of the summer of 2001, S.J.S. told her mother what had happened with See and Stites. Dawn testified at trial that she had called See and then the Florida police after S.J.S.'s disclosure. The following day, See called S.J.S. and told her that if she told the police what had happened, he would go to prison for the rest of his life. As a result, S.J.S. told the police that the abuse had been a dream.

{**¶14**} The following year, the summer of 2002, S.J.S. came to Ohio again to spend the summer with See and Stites. See began to have vaginal intercourse with S.J.S. on a regular basis. Two or three times during the summer of 2002, Stites made S.J.S. lick Stites's vagina and then Stites would lick S.J.S.'s vagina. This abuse continued each summer in 2003, 2004, and 2005. In 2005, S.J.S. cried while See had sex with her, and S.J.S. told See that she did not want to have sex anymore. S.J.S. never slept at See's home again.

5

{¶15} S.J.S. testified that the police had contacted her in 2012, after E.M.'s disclosure. S.J.S. lied to police and told them that she had never experienced abuse. S.J.S. testified that she had lied to police to protect See, but she regretted not coming forward to support E.M.

{¶16} Several other family members, including See and Stites's son and daughter, W.S., testified that they had never witnessed any abuse, nor had they been subjected to any abuse. Stites testified in her own defense and maintained that none of the sexual incidents happened, and that each of the girls had a motivation to lie. Stites testified that she and See had become the main caregivers for K.S.'s baby, and that Stites had threatened to take custody of the baby away from K.S. According to Stites, S.J.S. believed that Stites had been responsible for breaking up the marriage with S.J.S's biological father. Stites testified that she and See had kicked E.M. out of their home because of E.M.'s drug use and behavior.

{¶17} At the conclusion of the evidence presented at trial, the jury found Stites guilty of several crimes alleged to have occurred in the summer of 2001: four counts of rape with respect to S.J.S. as alleged in Counts 20, 21, 27, and 28; complicity to rape E.M. and S.J.S. as alleged in Counts 23 and 26; and gross sexual imposition with regard to E.M. and S.J.S. as alleged in Count 24.

{¶18} The jury found that Stites was complicit to See's rape of K.S., which the jury found had occurred sometime between 2007 and 2012 as alleged in Count 38. Also with respect to K.S., the jury found Stites guilty of two counts of endangering children as alleged in Count 39 and Count 41. Finally, the jury found Stites guilty of complicity to sexual battery with respect to E.M., which had occurred in early 2011 as alleged in Count 15.

6

{¶19} The jury found Stites not guilty of two counts of complicity to sexual battery with regard to E.M. and K.S., which had allegedly occurred in January 2012 and April 2015, as stated in Count 17 and Count 40.

{¶20} The trial court sentenced Stites to an aggregate sentence of 86 years in prison. Stites's appeal ensued.

## Admission of Hearsay Statements

{¶21} In Stites's first assignment of error, she argues that the trial court erred in admitting several hearsay statements. Hearsay is a "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶22} Stites argues that the trial court erred in admitting: (1) testimony from E.M.'s stepmother that E.M. had told her that she had been "taught how to treat a man the right way" in reference to See's abuse; (2) testimony from a Hamilton County Department of Job and Family Services caseworker that W.S. had appeared to be protecting her parents in the aftermath of K.S.'s disclosure; and (3) testimony from Stites's mother that K.S. had told her that she had sex with See.

{¶23} With respect to these three statements, the record shows that the trial court sustained defense counsel's objections at trial. The trial court also admonished the jury during final instructions that any statements or answers stricken by the court could not be considered as evidence. We presume that the jury followed the trial court's curative instructions. *State v. Fears*, 86 Ohio St.3d 329, 334, 715 N.E.2d 136 (1999).

{¶24} Stites also argues that the trial court erred in admitting testimony from E.M.'s biological father and S.J.S.'s biological mother recounting their daughters' abuse disclosures. E.M.'s father testified that in 2012, E.M. had told him

that See molested her, and Stites allowed the abuse to happen. Similarly, S.J.S.'s biological mother, Dawn, recounted how S.J.S. had disclosed to her that See touched her. Finally, Stites argues that the trial court erred in admitting testimony from K.S.'s school counselor and K.S.'s boyfriend regarding statements that K.S. had made to them. K.S.'s school counselor testified that K.S. had engaged in self-harming behavior, and that K.S. had said she was "in a dark place." K.S.'s boyfriend testified that K.S. had disclosed the sexual abuse to him.

{¶25} We agree with Stites that these statements are hearsay. Nevertheless, we determine that the admission of the hearsay statements was harmless beyond a reasonable doubt. *See* Crim.R. 52(A); *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23. E.M., S.J.S., and K.S. all testified at trial in detail regarding the sexual abuse they had endured. Even if we discard the hearsay testimony of which Stites complains, the evidence that these women experienced sexual abuse was overwhelming.

{¶26} Because we determine that the admission of the hearsay statements of which Stites complains were either cured by the trial court's sustained objections, or constituted harmless error, we overrule the first assignment of error.

**Evidence of Drug Use by Stites and the Victims' Post-Rape Struggles**

{¶27} In her second and third assignments of error, Stites argues that the trial court erred in admitting evidence of her drug use.

{¶28} On direct examination, Stites testified that she and See had kicked E.M. out of their home because of E.M.'s heroin use. E.M. then fabricated the abuse allegations in retaliation. The state questioned Stites as to whether she had ever smoked marijuana with E.M. The defense objected, and the trial court sustained the objection. The state questioned Stites as to whether she had used marijuana or

heroin. When Stites denied using drugs, the state then used recordings of Stites's jail calls to impeach her. In the recording, Stites can be heard discussing her experience with withdrawal after her arrest on the underlying charges in this case.

{¶29} Stites argues that the trial court erred in permitting the state to impeach her with extrinsic evidence. Impeachment of a witness with a prior inconsistent statement by extrinsic evidence is governed by Evid.R. 613(B), which provides:

Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness * * *.

{¶30} Consistent with Evid.R. 613(B), Evid.R. 608(B) prohibits introduction of extrinsic evidence of a witness's misconduct "for the purpose of attacking or supporting the witness's character for truthfulness [.]"

{¶31} The state's introduction of Stites's drug use, including the recorded jail calls where Stites discussed withdrawal, was not for the purpose of attacking her character for truthfulness. Instead, Stites's own drug use was directly relevant to her defense that she had refused to tolerate E.M.'s drug use, thus leading E.M. to lie

9

about the rapes. If Stites herself used drugs, it would make her defense to E.M.'s allegations much less plausible.

**{¶32}** Stites's fourth assignment of error challenges the trial court's admission of "victim-impact evidence."

**{¶33}** At trial, E.M. testified that she had a drug addiction, which had begun in 2012 after the grand jury refused to indict See. E.M. eventually became addicted to heroin. E.M.'s heroin addiction led her to steal from her grandparents, which resulted in a felony-burglary conviction and prison sentence. K.S. also testified that she had struggled emotionally and mentally in the aftermath of her abuse. K.S.'s school counselor testified that K.S. had engaged in self-harming behavior and had experienced struggles at school.

**{¶34}** Stites argues that the admission of evidence related to K.S.'s and E.M.'s behavior was unfairly prejudicial. Logically, any evidence submitted by the state is prejudicial to the defendant; however, the rules of evidence only bar evidence that is unfairly prejudicial. *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23; Evid.R. 403(A). "Unfairly prejudicial evidence usually appeals to the jury's emotions, rather than to intellect." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 112, citing *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001).

**{¶35}** The evidence related to E.M.'s drug abuse and K.S.'s mental and emotional struggles was not unfairly prejudicial. The evidence was probative of whether the women had been abused by their parents, or whether the abuse allegations had been an elaborate lie to get back at their parents, as Stites suggested. Thus, we determine that Stites's argument regarding unfair prejudice is without merit.

**{¶36}** Because we determine that the evidence related to Stites's drug use and the impact of the abuse on E.M. and K.S. was relevant and not unduly prejudicial, we overrule assignments of error two through four.



**Improper Vouching**

{¶37}  In her fifth assignment of error, Stites argues that the trial court erred in allowing the prosecutor to improperly vouch for the victims during opening statement and closing argument.

{¶38}  Improper vouching occurs when a prosecutor espouses a personal belief or opinion as to the credibility of a witness, or implies knowledge of facts outside the trial record.  *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232, citing *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997), and *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117. Improper vouching is reversible error unless it is "clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty." *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984), citing *United States v. Hasting*, 461 U.S. 499, 510-511, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

{¶39}  During opening statements, the prosecutor told the jury that the state could have charged See and Stites with "thousands" of criminal charges, but that it would have been impracticable to do so.

{¶40}  The prosecutor's comment that "thousands" of criminal charges could have been brought did not imply that the prosecutor had knowledge of facts outside the trial record.  Although the prosecutor's statement was hyperbolic, the victims testified that they had endured sexual abuse on a regular basis for years, and it would have been impracticable for the victims to recount each incident of abuse.  Even if the statement by the prosecutor had implied knowledge outside of the trial record, the defense objected to the prosecutor's statement, and the trial court immediately

admonished the jury that opening statements were not evidence. Therefore, any error did not amount to reversible error.

{¶41} Stites also alleges that the prosecutor improperly remarked to the jury during closing argument that the state had hundreds of recorded jail calls between See and Stites, and that a call "probably" existed where Stites had said, "Oh my gosh, I'm in trouble." The prosecutor's comment followed defense counsel's argument that the state had failed to produce a jail call in which Stites admitted liability. Stites also argues that prosecutor improperly remarked during closing: "I feel proud and I feel privileged to stand here today and support [the victims]." The trial court again immediately admonished the jury after counsel stated his opinion about the victims.

{¶42} Assuming that the prosecutor's statements were improper, the two statements were not so pervasive as to affect the impartiality of Stites's trial. In other words, absent these statements, the jury would have found Stites guilty beyond a reasonable doubt. Therefore, we overrule the fifth assignment of error.

## Grand-Jury Proceedings

{¶43} In Stites's sixth assignment of error, she argues that the trial court abused its discretion in admitting evidence regarding E.M.'s 2012 grand-jury proceeding, and in admitting evidence regarding the underlying grand-jury proceeding.

{¶44} Crim.R. 6(E) governs grand-jury secrecy, and it provides:

Deliberations of the grand jury and the vote of any grand juror shall not be disclosed. Disclosure of other matters occurring before the grand jury may be made to the prosecuting attorney for use in the performance of his duties only pursuant to this rule. A grand juror, prosecuting attorney, interpreter, court reporter, or typist who

13

transcribes recorded testimony, may disclose other matters occurring before the grand jury, only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No grand juror, officer of the court, or other person shall disclose that an indictment has been found against a person before such indictment is filed and the case docketed. The court may direct that an indictment shall be kept secret until the defendant is in custody or has been released pursuant to Rule 46. In that event the clerk shall seal the indictment, the indictment shall not be docketed by name until after the apprehension of the accused, and no person shall disclose the finding of the indictment except when necessary for the issuance of a warrant or summons. No obligation of secrecy may be imposed upon any person except in accordance with this rule.

{¶45} Stites argues that E.M.'s testimony violated Crim.R. 6(E). E.M. testified regarding how she had disclosed See's abuse in 2012, leading to a police investigation. E.M. did not testify in front of the 2012 grand jury. E.M. was told that the grand jury refused to issue an indictment against See because of "a lack of physical evidence."

{¶46} Crim.R. 6(E) does not impose any secrecy obligations on a victim in a grand-jury proceeding, except to the extent that it provides that no person can disclose that an indictment has been found until the indictment is filed and a case docketed. The rule also provides: "No obligation of secrecy may be imposed upon

any person except in accordance with this rule." Therefore, E.M.'s testimony regarding the 2012 grand-jury proceeding, which had occurred years prior and did not result in an indictment, does not violate Crim.R. 6(E).

{¶47} Stites also argues that the state improperly questioned Norwood Police Officer Kilby and Stites regarding the 2012 grand-jury proceeding. Officer Kilby testified that he had reviewed the grand-jury transcript from 2012. He noted that E.M. did not testify, but that Stites had "testified against" E.M. When the state cross-examined Stites, Stites admitted that she had testified at the 2012 grand-jury proceeding, and that her testimony was the same then as it was at trial.

{¶48} Officer Kilby's testimony that E.M. did not appear in front of the 2012 grand jury was merely cumulative of E.M.'s testimony. As to the evidence that Stites testified against E.M., Crim.R. 6(E) does not protect the grand-jury testimony of defendants or codefendants from later disclosure. *See* Crim.R. 16(J)(2); *State v. Greer*, 66 Ohio St.2d 139, 150, 420 N.E.2d 982 (1981). Moreover, the record indicates that the state notified Stites of its intent to use the 2012 grand-jury testimony at trial. Thus, Crim.R. 6(E) does not protect Stites's 2012 grand-jury testimony from disclosure at trial.

{¶49} Stites further argues that the admission of evidence related to the grand-jury proceeding in the underlying case violated Crim.R. 6(E). Stites argues that the trial court erred in allowing Officer Kilby to testify in general terms as to the grand-jury process, and to list the witnesses who testified before the grand jury. Stites argues that Officer Kilby should not have been able to list a grand-jury witness whom the state did not call as a witness at trial.

{¶50} It is not clear that Crim.R. 6(E) bars Officer Kilby's discussion of the grand-jury process, or that Crim.R. 6(E) bars Officer Kilby from listing the names of

15

witnesses who testified at grand jury. Moreover, Officer Kilby did not disclose the substance of any of the witnesses' testimony. Therefore, Stites has not demonstrated that Officer Kilby's testimony related to the underlying grand-jury proceeding amounted to plain error. *See* Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (a party claiming plain error under Crim.R. 52(B) must show that an obvious error occurred, which affected the outcome of the trial).

{¶51} Because the admission of evidence related to the 2012 and underlying grand-jury proceedings did not violate Crim.R. 6(E) and did not otherwise amount to plain error, we overrule Stites's sixth assignment of error.

**Expert Opinions**

{¶52} In Stites's seventh assignment of error, she argues that the trial court erred in permitting Officer Kilby and K.S.'s school counselor to render expert opinions without qualifying them as experts.

{¶53} Stites relies on *State v. Hall*, 1st Dist. Hamilton No. C-170699, 2019-Ohio-2985. In *Hall*, the state qualified a police officer as an expert in the midst of a defendant's sexual-assault trial without having supplied an expert-witness report as required under Crim.R. 16(K). The trial court permitted the officer to testify that children normally delay in reporting abuse, and that sexual assaults against children typically occur by trusted individuals. The *Hall* court determined that the trial court erred in allowing the officer to testify as an expert, and that the officer's testimony improperly bolstered the victims' testimony. The *Hall* court determined that the admission of the officer's expert opinion was not harmless beyond a reasonable doubt where prosecutorial misconduct had also occurred.

{¶54} Officer Kilby testified that, in his experience, child-sexual-abuse victims do not typically delay reporting. Officer Kilby testified that child victims do

16

not behave in any "typical way" during an interview. Unlike the police officer in *Hall* who testified as an expert for the state, Officer Kilby testified regarding his personal experience as a police officer, he was never qualified as an expert, and he did not purport to offer any expert opinion tied to the facts of this case, and thus he did not render an expert opinion.

{¶55} Stites also takes issue with a portion of Officer Kilby's testimony regarding the jail-house calls made between See and Stites. The state questioned Officer Kilby as to whether he had ever heard the name "John Zieger" mentioned during the calls, to which Officer Kilby responded that he had not. The state asked Officer Kilby whether the investigation had led to the existence of a perpetrator other than the defendants, and Officer Kilby testified that it had not.

{¶56} Officer Kilby did not offer any expert opinions regarding the absence of other perpetrators. The state introduced Officer Kilby's testimony to rebut the defense's argument that multiple people had been in and out of the See home over the years, and that perhaps someone else could have been the perpetrator. Again, Officer Kilby did not render an expert opinion.

{¶57} Stites also takes issue with testimony from the Norwood school counselor, who had dealt with K.S.'s emotional disturbances at school. The counselor testified that she believed that K.S. had been struggling with mental-health issues. When asked if K.S.'s behavior could be consistent with someone struggling with sexual abuse in the home, the counselor testified that it "could also point to a student who is struggling with some abuse in the home." The school counselor also testified that it did not surprise her to learn of the sexual-abuse allegations in this case.

**{¶58}** Just like Officer Kilby, K.S.'s school counselor was never qualified as an expert and did not render an expert opinion. Although the counselor testified that K.S.'s struggles "could" have been caused by sexual abuse, and that she was not surprised to learn about K.S.'s allegations, these statements do not constitute an expert opinion regarding the cause of K.S.'s behavior as tied to the facts of this case.

**{¶59}** Because the state did not offer improper expert-opinion testimony, we overrule Stites's seventh assignment of error.

### Photographs of Victims as Children

**{¶60}** In Stites's eighth assignment of error, she argues that the trial court erred in allowing the state to introduce photographs of the victims as children.

**{¶61}** Evid.R. 403(A) provides that relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The admission of photographic evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Morales*, 32 Ohio St.3d 252, 257, 513 N.E.2d 267 (1987).

**{¶62}** At the conclusion of the state's direct examination of the victims, the prosecutor asked each victim to identify a picture of herself taken at a young age— approximately the time the abuse began. Stites argues that the photographs of the victims as children had no probative value and were used merely to play to the jury's emotions.

**{¶63}** The photographs of the victims as children were probative of the victims' young ages at the time the abuse began, especially in light of the fact that the victims had reached adulthood by trial. The photographs did not unfairly prejudice Stites. See raised a similar objection in his appeal, which this court overruled. *See*

*State v. See*, 1st Dist. Hamilton Nos. C-190251 and C-190252, 2020-Ohio-2923, ¶ 43-44, citing *State v. Davis*, 7th Dist. Mahoning No. 05MA3, 2007-Ohio-1397, ¶ 39, and *State v. Carey*, 5th Dist. Licking No. 2008-CA-20, 2009-Ohio-103, ¶ 100.

{¶64} Because the trial court did not abuse its discretion in admitting the photographs of the victims as young children, we overrule Stites's eighth assignment of error.

**Insufficient Evidence**

{¶65} In Stites's ninth assignment of error, she argues that the trial court erred in denying her Crim.R. 29 motion for an acquittal on several counts of the indictment. Stites argues that the evidence was insufficient to support the complicity-to-rape and child-endangering convictions with respect to K.S., the complicity-to-rape and gross-sexual-imposition convictions with respect to E.M., and the complicity-to-rape and rape charges with respect to S.J.S.

{¶66} When reviewing a challenge to the sufficiency of the evidence, this court must view the evidence in a light most favorable to the prosecution, and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. We will examine the evidence as to each victim in the light most favorable to the state to determine whether any rational juror could have found the elements of the offenses proven beyond a reasonable doubt.

Convictions related to K.S.

{¶67} In Count 38, the state alleged that Stites had committed complicity to rape involving K.S., sometime from January 2007 to July 2012. Complicity is defined in R.C. 2923.03, and it provides in relevant part that "[n]o person, acting

with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C. 2923.03(A)(2). "Aid" or "abet" as used in the complicity statute means " '[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.' " *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), quoting *Black's Law Dictionary* 69 (7 Ed.Rev.1999). Stites argues that the evidence was insufficient to establish that she aided or abetted K.S.'s rape.

{¶68} K.S. testified that See had started engaging in sexual contact with her when she was approximately six years old. Stites knew about the abuse K.S. endured, because Stites "walked in" on K.S. and See while they were engaged in sexual activity when K.S. was around ten or 11 years old, sometime from 2009 to 2010. K.S. testified that See had begun having sexual intercourse with her around the age of 11, sometime in the summer of 2010. Stites also knew that See raped K.S., because Stites asked K.S. how she felt about her father taking her virginity. K.S. further testified that on days when Stites had found out that K.S. and See had engaged in sex acts, Stites would start fights with K.S. and with See. This evidence is sufficient for the jury to infer that Stites knew See sexually abused their minor daughter, and that Stites facilitated the abuse in their home.

{¶69} In Counts 39 and 41, the state charged Stites with child endangering with respect to K.S during the 2007-to-2012 timeframe, and April 2015. Stites again argues that the state failed to prove that she knew about the abuse, but, as we have determined, the evidence belies Stites's argument.

Convictions related to E.M.

{¶70} In Counts 23 and 24, the state alleged that Stites had committed complicity to rape and gross sexual imposition with regard to E.M. in the summer of

2001. Stites argues that the evidence was insufficient to support that she had aided See in raping E.M., or that she was present when S.J.S. and E.M. were made to digitally penetrate each other.

{¶71} According to E.M., when she was five years old in the summer of 2001, See made her perform fellatio on him, and she watched S.J.S. perform fellatio on See. Although E.M. could not recall Stites participating in the summer 2001 incident, S.J.S., who was around eight years old at the time, recalled that Stites was present during the incident, and that Stites had actively encouraged the girls to penetrate each other. We determine that the evidence was sufficient to sustain the convictions on Counts 23 and 24.

<u>Convictions related to S.J.S.</u>

{¶72} In Counts 24, 26, and 27, the jury found that Stites had committed gross sexual imposition, complicity to rape, and rape with regard to S.J.S. in the summer of 2001.

{¶73} According to S.J.S., Stites forced S.J.S. to digitally penetrate E.M. This evidence is sufficient evidence to sustain gross sexual imposition as stated in Count 24.

{¶74} S.J.S. also testified that See had forced her to perform oral sex on him, and that Stites had been present when See first penetrated her with his penis. S.J.S. testified:

Q. When you gave him a blow job, what happened next; do you remember?

A. We went into the bedroom, and then he tried – like we tried to, like – he tried to put his penis inside me, but it hurt and he just rubbed it on there but he didn't put it inside me.

21

Q.      Eight years old at the time?

A.      Yes.

Q.      Had you ever had sexual intercourse?

A.      No.

Q.      *** He didn't put his penis all the way inside you; is that what you are saying?

A.      He didn't, no.

Q.      Did he at all make any penetration in his attempt to do this?

A.      It was like he didn't put it inside me, no.  He just rubbed it on me.

Q.      Did it go between the lips of your vagina?

A.      Yes.

{¶75}  Any penetration, however slight, is sufficient evidence for rape.  *State v. Strong*, 1st Dist. Hamilton No. C-100484, 2011-Ohio-4947, ¶ 54 ("penetration of the labia was sufficient to prove penetration of the vagina for purposes of satisfying the element of sexual conduct as defined in R.C. 2907.01(A)").  Thus, the evidence was sufficient to sustain Stites's conviction for complicity to rape as stated in Count 26.

{¶76}  According to S.J.S., she had performed cunnilingus on Stites and Stites had performed cunnilingus on her during the summer of 2001.  These actions formed the basis of the state's rape charges as listed in Count 20 and Count 21.  Similarly, Count 27 alleged that Stites had performed cunnilingus on S.J.S. during the summer of 2001.  However, S.J.S. testified that she did not remember having had "oral sex" with Stites other than one time that summer.  The state concedes that the evidence at trial was insufficient to prove that Stites raped S.J.S. more than once

during the summer of 2001. Therefore, the evidence was insufficient to sustain Stites's rape conviction in Count 27.

{¶77} We sustain in part Stites's ninth assignment of error as to Count 27 only, and we overrule the remainder of the ninth assignment of error.

**Merger**

{¶78} In her tenth assignment of error, Stites argues that the trial court erred in failing to merge some of her offense under R.C. 2941.25.

{¶79} R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶80} The Ohio Supreme Court has explained R.C. 2941.25 as follows:

1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.

2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses

involving separate victims or if the harm that results from each offense is separate and identifiable.

3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, syllabus.

{¶81} First, Stites argues that the offense of child endangering under R.C. 2919.22 with respect to K.S. as charged in Count 39 should have merged with the offense of complicity to rape with respect to K.S. as charged in Count 38. The state contends that the offenses of child endangering and complicity to rape do not merge, because they are offenses of dissimilar import.

{¶82} The Ohio Supreme Court elaborated on offenses of dissimilar import in *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266. In *Early*, the Ohio Supreme Court determined that aggravated vehicular assault and operating a motor vehicle while under the influence of drugs or alcohol ("OVI") did not merge under the allied-offense statute, even though the OVI offense served as the predicate conduct for the aggravated vehicular assault. The court reasoned that aggravated vehicular assault "has a different import and significance" than OVI, such that "[t]here is a legitimate justification for criminalizing each of these offenses separately[.]" *Id.* at ¶ 15.

{¶83} Applying *Early*, the Fifth Appellate District determined that the offenses of murder and child endangering did not merge, reasoning that

the murder statute at issue in this matter is intended to punish the taking of a human life while engaging in violence against another, while the proscription against child endangering, in principle, is for the separate overall purpose of protecting children against any type of abuse or torture, which, in this instance, resulted in serious physical harm and eventual death. Therefore, even though the two offenses were based on the same course of conduct timeframe * * *, we hold the trial court in the case sub judice did not err in refusing to merge the two offenses for sentencing.

*State v. Miku*, 2018-Ohio-1584, 111 N.E.3d 558, ¶ 79 (5th Dist.).

{¶84} R.C. 2919.22 pertains to the duty of care and protection a parent or a person acting in loco parentis has with respect to a child. Complicity to rape, on the other hand, criminalizes actual physical harm regardless of the relationship between the victim and the perpetrator. The fact that Stites was K.S.'s mother makes her crimes different than if Stites had just been an unrelated person aiding and abetting See's rapes.

{¶85} Therefore, child endangering and complicity to rape are offenses of dissimilar import, and the trial court did not err in failing to merge them.

{¶86} Next, Stites argues that Counts 20 and 21 should have merged. Counts 20 and 21 relate to cunnilingus between Stites and S.J.S. According to the testimony offered by S.J.S. at trial, these offenses occurred on the same night and close in time. Nevertheless, the state contends that these offenses were committed separately, and thus the trial court did not err in failing to merge them.

{¶87} Different sexual acts are considered separate offenses. *State v. Grant*, 2d Dist. Montgomery No. 19824, 2003-Ohio-7240, ¶ 59, citing *State v. Nicholas*, 66

25

Ohio St.3d 431, 613 N.E.2d 225 (1993) ("Offenses involving distinct, different sexual activity each constitute a separate crime with a separate animus, and are not allied offenses of similar import, even when they are committed in the course of the same encounter."). The Eighth Appellate District determined that two counts of gross sexual imposition did not merge where one count was related to the touching of the victim's breast and the other for the vaginal area. *State v. Kalka*, 8th Dist. Cuyahoga No. 106339, 2018-Ohio-5030, ¶ 56.

{¶88} The act of Stites performing cunnilingus on S.J.S. and the act of S.J.S. performing cunnilingus on Stites are different sexual acts. Therefore, we agree with the state that Counts 20 and 21 do not merge.

{¶89} Because we determine that the trial court did not err in failing to merge offenses as allied offenses of similar import, we overrule Stites's tenth assignment of error.

## Conclusion

{¶90} We reverse Stites's conviction on Count 27, as the state concedes that the evidence presented at trial was insufficient to sustain that conviction. We remand the matter to the trial court with instructions to vacate Stites's conviction on Count 27 and to docket an amended sentencing entry reflecting a total aggregate sentence of 76 years. In all other respects, the judgment of the trial court is affirmed.

Judgment affirmed in part, reversed in part, and cause remanded.

**MYERS, P.J.,** and **BERGERON, J.,** concur.

Please note:
    The court has recorded its own entry this date.