JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Thomia Hunter, appeals the judgment of the Common Pleas Court, rendered after a jury verdict, finding her guilty of felony murder and felonious assault and sentencing her to 15 years to life in prison. For the reasons that follow, we affirm the conviction but vacate the sentence and remand for resentencing.
 {¶ 2} In July 2004, the Cuyahoga County Grand Jury returned a three-count indictment against Hunter. Counts one and two charged her with murder in violation of R.C. 2903.02(A) and (B), respectively. Count three charged her with felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony.
 {¶ 3} The trial court subsequently denied Hunter's motion to suppress oral statements.
 {¶ 4} Testimony at trial demonstrated that during the early morning hours of June 17, 2004, Cleveland police and an EMS unit responded to Hunter's 911 call regarding "two people stabbed" at her apartment located at 10701 Woodland. When EMS arrived on the scene, Hunter was standing outside the doorway of her apartment, waving the emergency vehicles to her apartment, and Andrew Harris was lying on his back on the floor inside the apartment, near the front doorway. There was blood on the floor and on Harris. When the EMS technicians removed his jeans in an attempt to treat him, a "bucket of blood" poured onto the floor.
 {¶ 5} While the EMS technicians attempted to resuscitate Harris, Hunter kicked at his foot and told him to "get up; quit playing." When EMS technician Daniel Nemeth attempted to remove Hunter from the apartment, she told him, "I don't know why you're messing with him. I'm the one that's stabbed." None of the EMS technicians who examined Hunter found any stab wound on her, however.
 {¶ 6} Officer Jaclyn Skiba testified that when she walked up to Hunter as she stood outside her apartment, Hunter told her, "He can't be dead. I stabbed him in the leg." Skiba testified that she then arrested Hunter and advised her of her Miranda
rights. According to Skiba, Hunter was coherent and appeared to understand her rights, although she was "shaken up" and concerned about Harris' condition. Hunter then told Skiba that she and Harris had been drinking that day at her mother's house and had begun arguing there. The argument continued when they reached Hunter's apartment. Hunter then again told Skiba, "He can't be dead; I only stabbed him in the leg."
 {¶ 7} Skiba accompanied Hunter into the EMS truck on the scene for an examination. Skiba observed only a small laceration on Hunter's left knee and Hunter did not point out any other injuries to Skiba or the EMS technicians.
 {¶ 8} Cleveland Police Detective Harry Matlock spoke with Hunter a short time later as she waited in a police car at the scene. He testified that she "seemed upset" and had tears in her eyes, but did not appear to be intoxicated. After Matlock advised Hunter of her Miranda rights, he asked her what had happened. Hunter told him that she and Harris had been in an on-again, off-again relationship for about two years. On that day, they had been drinking at her mother's house. They returned to Hunter's apartment at approximately 10:00 p.m. and had sex. Hunter stated that they got into an argument when Harris accused her of cheating on him. Hunter told Matlock that Harris started "poking" a knife at her and, at some point, she picked up another knife and stabbed him.
 {¶ 9} Matlock spoke with Hunter again several hours later after she was booked and brought to the Justice Center. He asked her to read her rights out loud from a poster hanging on the wall, and she did. Upon being questioned, she told Matlock that she understood her rights and then reiterated what she had told him earlier. According to Matlock, she did not complain of any injuries.
 {¶ 10} Two kitchen steak knives were recovered from the scene. Only one of the knives had blood on it; the blood was solely from Harris. Blood was also found on the mini-blinds in the living room of Hunter's apartment, on the kitchen floor, and on the floor of a closet in the rear of the apartment. The DNA unit of the Cuyahoga County Coroner's Office tested blood samples taken from these locations and determined that the blood was from Harris.
 {¶ 11} Dr. Joseph Felo, a forensic pathologist in the Cuyahoga County Coroner's Office, performed an autopsy on Harris. He concluded that Harris had sustained nine deeper, or stab, wounds to his right chest, right armpit, right upper arm, the right side of his navel, outer left thigh, and the outside of his left knee. He also sustained thirteen "incised," or shallower, wounds to his right shoulder, left chest, the left side of his navel, right upper arm, the back of his left hand and left index finger, and the back of his fingers on his right hand. According to Dr. Felo, all of the wounds were caused by "a mild amount of force" and none of them were deep, "plunging-type" wounds.
 {¶ 12} Dr. Felo determined that the stab wound to the outside of Harris' left knee was approximately three inches deep. The wound severed a major artery and a major vein behind the left knee and caused Harris to lose a significant amount of blood. According to Dr. Felo, this wound caused Harris to bleed to death within 30 minutes to an hour after he sustained the wound.
 {¶ 13} Curtis Jones, a supervisor in the Trace Evidence Department of the Cuyahoga County Coroner's Office, testified that he analyzed various items of Harris' clothing for "defects," which are holes in fabric that are created by a knife or bullet. Jones found several defects on Harris' clothing, but none on the dress that Hunter was wearing at the time of her arrest. Jones determined that Harris' blood was on the left shoulder and the back of Hunter's dress.
 {¶ 14} Three witnesses testified for the defense. Pamela Davis-Hemphill testified that she employed Hunter as a private police officer for two years in her private security company. She testified that Hunter was an excellent employee and that she had never received any complaints that Hunter had misused her authority.
 {¶ 15} Hunter's daughter, Marshia, testified that she had observed arguments between Hunter and Harris when they lived together. She had seen Harris kick in a door and throw things around when he got angry and she once saw him slam Hunter against a couch. On another occasion after Hunter and Harris argued, she and her mother left the residence and stayed in a hotel so Harris would not find them. According to Marshia, the incidents occurred when Harris had been drinking.
 {¶ 16} During her testimony, Hunter claimed self-defense. She testified that she had known Harris for seven years and had become romantically involved with him in 2001. She and Harris lived together with her daughter for a year and a half, but she ended the relationship and moved out in 2003 because she and Harris argued frequently and he would become violent. Hunter renewed her friendship with Harris in January 2004. They did not live together but occasionally had sex.
 {¶ 17} Hunter testified that on June 17, 2004, she and Harris spent the day together. They began drinking at approximately 10:00 a.m. at her mother's apartment, then went to the movies with her daughter and several of her daughter's friends. After they dropped the girls off at home, they returned to her mother's apartment and continued drinking.
 {¶ 18} They returned to Hunter's apartment at approximately 10:00 p.m. Hunter cooked for Harris, took a bath, and then laid down on the futon to watch TV. She and Harris had sex; she awoke a short time later when Harris began yelling at her and accusing her of cheating on him. When Hunter told Harris to leave, he hit her and knocked her back on the futon. Hunter began kicking at Harris, who attempted to fend off the kicks. When he turned around, he had a knife in his hand and cut her leg. Harris started "poking" the knife at Hunter, so she got to her feet and backed toward the kitchen. Hunter began swinging her arms to fend off Harris, but he continued to hit her. Hunter saw a knife on the kitchen counter, picked it up, and began "poking at him with the knife."
 {¶ 19} Hunter testified that Harris then "picked me up by my throat and started slamming me back and forth. I was just poking at him with the knife until he let me down." When Harris let her go, Hunter fell to the ground but kept "poking" at Harris so he would back up. While Harris was backing up, he kept hitting Hunter.
 {¶ 20} Hunter began running for the front door, but Harris caught her from behind and began choking her. She fell down on the futon with Harris on top of her back. Harris pulled her head back, grabbed hot sauce and poured it on her eyes, while she kept trying to poke at him with the knife. Harris got up, pulling Hunter with him, but then staggered and fell into the mini-blinds.
 {¶ 21} Hunter backed away from Harris, who then gathered his things and walked to the door. When he opened the door, however, he turned around, grabbed his chest, and fell. When Harris did not move, Hunter called 911.
 {¶ 22} The jury subsequently found Hunter not guilty of murder as charged in count one, but guilty of felony murder as charged in count two and guilty of felonious assault. At the sentencing hearing, the trial judge sentenced her to 15 years in prison. The trial court subsequently issued a nunc pro tunc entry changing the sentence to 15 years to life in prison.
 {¶ 23} Hunter now appeals and asserts eight assignments of error for our review. For clarity, we consider the assignments of error out of their assigned order.
 MOTION TO SUPPRESS {¶ 24} In her first assignment of error, Hunter contends that the trial court erred in denying her motion to suppress the inculpatory statements she made to Officer Skiba and Detective Matlock. Hunter argues that she did not knowingly, intelligently, or voluntarily waive her Miranda rights and, accordingly, her statements to Officer Skiba and Detective Matlock were obtained in violation of these rights.
 {¶ 25} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. State v.Broom (1988), 40 Ohio St.3d 277. Because the trial court is in the best position to assess credibility and resolve issues of fact, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. O'Linn
(Mar. 16, 2000), Cuyahoga App. No. 75815. Then, accepting these facts as true, we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether they meet the applicable legal standard. Id.
 {¶ 26} The Fifth Amendment to the United States Constitution guarantees that "no person * * * shall be compelled in any criminal case to be a witness against himself." Pursuant toMiranda v. Arizona (1966), 384 U.S. 436, 16 L.Ed.2d 694,86 S.Ct. 1602, this privilege is protected by advising a person subject to custodial interrogation, in clear and unequivocal language, that he has the right to remain silent.384 U.S. at 467-68. Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. Id. at 444.
 {¶ 27} Initially, we note that Hunter's statement to Officer Skiba that "he can't be dead. I stabbed him in the leg," was made as Skiba approached Hunter when she was standing outside her apartment. The statement was unsolicited and not made in response to any questioning by Officer Skiba. Furthermore, Hunter was not in custody at that time. Accordingly, Miranda and the law concerning the waiver of Miranda rights does not apply and, therefore, the trial court did not err in refusing to suppress this statement.
 {¶ 28} We must determine, however, whether the statements Hunter later made to Officer Skiba and Detective Matlock after she had been arrested were voluntary. The test of whether a statement was voluntarily made rests upon the determination of whether the totality of the circumstances demonstrates that the statements were of the accused's free and rational choice.O'Linn, supra, citing Greenwald v. Wisconsin (1968),390 U.S. 519, 20 L.Ed.2d 77, 88 S.Ct. 1152; State v. Jenkins (1984),15 Ohio St.3d 164.
 {¶ 29} At the hearing on Hunter's motion to suppress, Officer Skiba testified that Hunter was shaken up, but was coherent and appeared to understand her rights. Detective Matlock testified that he advised Hunter of her rights before he spoke to her on the scene and that she appeared to understand those rights. He testified further that, although she was upset and had tears in her eyes, she was not slurring her words nor did she appear to be intoxicated. Detective Matlock testified further that several hours later, Hunter read her rights as they were listed on a poster on the wall of the Justice Center and told him that she understood those rights. She repeated the story she had told him earlier, and then told him that she did not wish to give a written statement.
 {¶ 30} Under the totality of these circumstances, we conclude that Hunter knowingly, voluntarily and intelligently waived herMiranda rights. Although she was understandably distraught over the events of the evening, we cannot conclude that her mental faculties were so impaired as to render her statements involuntary. Hunter produced no evidence at the suppression hearing to suggest that she was incapable of understanding her rights or the subsequent waiver.
 {¶ 31} Appellant's first assignment of error is overruled.
 MOTION TO DISMISS COUNT TWO OF THE INDICTMENT {¶ 32} R.C. 2903.02(B) provides that "no person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." Count two of the indictment charged Hunter with causing the death of Harris "as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, in violation of Section 2903.02 of the Revised Code."
 {¶ 33} In her second assignment of error, Hunter contends that the trial court erred in denying her motion to dismiss this count of the indictment. Specifically, Hunter contends that the indictment failed to specify the underlying felony which caused the victim's death and, therefore, violated her Fifth Amendment right to be tried on the same evidence presented to the grand jury, her Sixth Amendment right to be informed of the nature and cause of the State's accusation, and her right to due process of law. We disagree.
 {¶ 34} This court considered the same issue in State v.Jones, Cuyahoga App. No. 80737, 2002-Ohio-6045, and concluded that the State's indictment need not specify the underlying felony. We noted that Crim.R. 7(B), which governs the nature and contents of an indictment, provides that an indictment "may be in the words of the applicable section of the statute as long as the words of that statute charge an offense." Id. at ¶ 39. We noted further that R.C. 2941.14(A) provides that "in an indictment for aggravated murder, murder, or voluntary or involuntary manslaughter, the manner in which or the means by which the death was caused need not be set forth." Id. at ¶ 41. We then reviewed cases that had considered the same issue in the context of involuntary manslaughter, which, as in R.C. 2903.02(B) felony murder, also predicates itself on an underlying offense, and found that it is well established that specification of the underlying felony or misdemeanor in an indictment for involuntary manslaughter is not required. Id. at ¶ 42. Accordingly, we concluded in Jones that in the context of felony murder, the indictment need not specify the underlying felony.
 {¶ 35} We reach the same conclusion here. Count two of the indictment stated the offense in the words of the statute, in conformity with Crim.R. 7(B). Further, the lack of particularization in the indictment of the underlying offense which caused the death is authorized by R.C. 2941.14.
 {¶ 36} Moreover, contrary to Hunter's argument, she was not convicted in count two on evidence that was not presented to the grand jury. Count three charged Hunter with felonious assault in violation of R.C. 2903.11, a second degree felony, and alleged that Hunter caused or attempted to cause physical harm to Harris by means of a deadly weapon; to wit, a knife. Count three was the "offense of violence" referred to in count two. Given the grand jury's finding of probable cause regarding the felonious assault charge of count three, it is apparent that the grand jury heard evidence regarding the underlying "offense of violence" before indicting Hunter on count two.
 {¶ 37} Finally, despite Hunter's argument to the contrary,Apprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435, is not applicable to this issue. In Apprendi,
the United States Supreme Court held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Accordingly, juries — not judges — are required to determine any fact that raises a sentencing ceiling. Here, there is no dispute that the jury found Hunter guilty of felonious assault, the underlying offense of violence set forth in count two of the indictment. Hunter's sentence was not more than the maximum allowed by statute. Accordingly, Apprendi is simply not relevant to this matter.
 {¶ 38} Finally, as was noted in Jones, supra, "R.C.2903.02(B) * * * has been challenged numerous times by defendants convicted under this statute. The courts, including our court, have consistently determined that the statute passes constitutional muster."
 {¶ 39} Appellant's second assignment of error is therefore overruled.
 SUFFICIENCY OF THE EVIDENCE {¶ 40} In her sixth assignment of error, Hunter contends that the evidence was insufficient to sustain her conviction for felony murder.
 {¶ 41} A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the State has met its burden of production at trial. State v.Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52. On review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 42} Hunter was convicted of felony murder as defined in R.C. 2903.02(B), which provides in pertinent part:
 {¶ 43} "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
 {¶ 44} Felonious assault was the underlying offense of violence. Felonious assault, a second degree felony, is defined by R.C. 2903.11:
 {¶ 45} "(A) No person shall knowingly * * *
 {¶ 46} "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 47} Hunter argues that the evidence was insufficient to sustain her conviction for murder because the State did not demonstrate that she "knowingly" inflicted the injuries that resulted in Harris' death. Hunter asserts that she is not guilty of murder because she did not know that a stab wound to the knee would result in Harris' death. In short, Hunter contends that her murder conviction is unsupported by the evidence because the State failed to prove that she intended to cause the victim's death.
 {¶ 48} Under the felony murder statute, however, a defendant may be found guilty of murder even if he did not "intend" to cause the victim's death. State v. Miller, 96 Ohio St.3d 384,2002-Ohio-4931, at ¶¶ 31-34. The critical issue is whether the defendant had the requisite culpable mental state to support a conviction for the underlying felony offense. Id. See, also,State v. Berry, Cuyahoga App. No. 83756, 2004-Ohio-5485, at ¶35, citing State v. Irwin, Hocking App. Nos. 03CA13 03CA14,2004-Ohio-1129.
 {¶ 49} As stated earlier, felonious assault was the underlying offense supporting the felony murder charge in this case. To sustain a conviction for felony murder, the State had to prove that Hunter "knowingly" caused physical harm to Harris. As the Ohio Supreme Court explained in Miller, supra, "a person acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." State v. Miller, 96 Ohio St.3d 384,2002-Ohio-4931, at ¶ 31 (emphasis in original).
 {¶ 50} The evidence showed that Harris sustained 22 knife wounds and Hunter admitted that she stabbed him. This evidence, if believed, was sufficient to demonstrate that Hunter knowingly caused serious physical harm to Harris. Cf. State v. Lampkins
(May 18, 1993), Franklin App. No. 92AP-1570 ("A person who stabs another eight times intends to cause serious physical harm * * *.")
 {¶ 51} Appellant's sixth assignment of error is therefore overruled.
 MANIFEST WEIGHT OF THE EVIDENCE {¶ 52} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. State v.Thompkins (1997), 78 Ohio St.3d 380, 390. When considering an appellant's claim that the conviction is against the weight of the evidence, the reviewing court sits essentially as a "`thirteenth juror' and [may] disagree with the factfinder's resolution of the conflicting testimony." Id. at 387, quotingTibbs v. Florida (1982), 457 U.S. 31, 42. The reviewing court must examine the entire record, weighing the evidence and considering the credibility of witnesses, while being mindful that credibility generally is an issue for the trier of fact to resolve. State v. Thomas (1982), 70 Ohio St.2d 79, 80. This court may reverse the judgment of conviction if it appears that the factfinder, in resolving conflicts in the evidence, "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.Martin, supra.
 {¶ 53} In her fifth assignment of error, Hunter argues that her conviction for felony murder was against the manifest weight of the evidence because she proved that she acted in self-defense.
 {¶ 54} To establish the affirmative defense of self-defense, an accused must prove by a preponderance of the evidence that he 1) was not at fault in creating the situation giving rise to the death of the victim; 2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and 3) did not violate any duty to avoid the danger. State v.Williford (1990), 49 Ohio St.3d 247. The elements of self-defense are cumulative. If the defendant fails to prove any one of the elements, he has failed to demonstrate that he acted in self-defense. State v. Jackson (1986), 22 Ohio St.3d 281,284.
 {¶ 55} Here, the evidence presented by Hunter did not support a finding of self-defense because she did not demonstrate that she had a bona fide belief that she was in imminent danger of death or great bodily harm which would entitle her to stab and cut Harris 22 times. Although she testified that Harris began "poking" at her with a knife that night, the other evidence presented at trial refutes this contention. Two knives were recovered from the scene the night of the murder. Although Hunter claimed that Harris used a knife to cut her leg, only one of the two knives had blood on it and the blood was only that of Harris. Hunter's blood was not found on the knife. Moreover, the only blood found in the apartment — in the living room, on the blinds, and on the floor of a closet in the rear of Hunter's apartment — belonged to Harris.
 {¶ 56} The evidence also showed that Hunter did not complain of any injuries caused by Harris other than the single scrape on her knee. Thus, even if we assume that Harris caused the scrape on Hunter's knee, the evidence demonstrates that Hunter used excessive force — 22 knife wounds to Harris as opposed to one wound to Hunter — to defend herself. "If the force used is so greatly disproportionate to appellant's apparent danger to show an unreasonable purpose to injure the victim, then the defense of self-defense is not available." State v. Jackson (1986),22 Ohio St.3d 281, 284.
 {¶ 57} After reviewing the entire record, weighing the evidence and considering the credibility of the witnesses, we are not persuaded that the jury lost it way and created such a miscarriage of justice that Hunter's conviction for felony murder must be reversed.
 {¶ 58} Appellant's fifth assignment of error is therefore overruled.
 LESSER INCLUDED OFFENSE OF RECKLESS HOMICIDE {¶ 59} In her fourth assignment of error, Hunter contends that the trial court erred in denying her request to instruct the jury regarding the lesser included offense of reckless homicide as defined in R.C. 2903.041.
 {¶ 60} Reckless homicide is a lesser included offense of felony murder. State v. Berry, Cuyahoga App. No. 83756,2004-Ohio-5485, at ¶ 48. The difference between felony murder and reckless homicide is in the requisite mens rea. As noted earlier, one acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person acts recklessly, however, when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C.2901.22(C).
 {¶ 61} Even though an offense may be a lesser included offense of another, a charge on the lesser included offense is required only when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. State v. Thomas
(1988), 40 Ohio St.3d 213, paragraph two of the syllabus.
 {¶ 62} We find no evidence in the record to support an instruction that Hunter acted recklessly, rather than knowingly. Indeed, Hunter testified that she "poked" the knife at Harris to intentionally defend herself against his attack. Although she may not have intended to kill him, it is apparent that she intended to injure him. Her actions were purposeful and not merely reckless.
 {¶ 63} Appellant's fourth assignment of error is overruled.
 VICTIM IMPACT TESTIMONY {¶ 64} Gertrude Harris, the victim's mother, testified during the State's case-in-chief. On direct examination, in response to the prosecutor's question regarding what her son's "overall disposition" was, Ms. Harris testified that "he was mild-mannered." In response to the prosecutor's question whether she was aware of any violent tendencies that her son had, Ms. Harris testified, "No, because he would always try to keep peace between everybody." The trial court overruled defense counsel's objections to both questions.
 {¶ 65} In her third assignment of error, Hunter argues that the trial court erred in allowing Ms. Harris' testimony regarding her son's personality because it constituted impermissible victim impact testimony.
 {¶ 66} Victim impact evidence is that which elicits the effect that the victim's death has had on family members. Statev. Fautenberry (1995), 72 Ohio St.3d 435, 439. Thus the testimony that Hunter objects to was clearly not victim impact testimony. Rather, it was evidence of the victim's character.
 {¶ 67} Evid.R. 404(A), in pertinent part, provides that "evidence of a person's character or a trait of his character is not admissible * * * subject to the following exclusions:
 {¶ 68} "(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same * * * is admissible * * *." (Emphasis added).
 {¶ 69} Pursuant to Evid.R. 404(A), in cases where an accused argues self-defense, evidence of the victim's character may be offered by the accused to demonstrate that the victim was more likely the aggressor. See, e.g., State v. Baker (1993),88 Ohio App.3d 204. Here, however, contrary to the prosecutor's argument, Ms. Harris' testimony was not offered to rebut any evidence of character offered by Hunter. Defense counsel made no argument regarding self-defense in opening statement nor did he elicit any testimony regarding Harris' character on cross-examination of the witnesses who testified prior to Ms. Harris during the State's case-in-chief. Although the prosecutor argues that such testimony was elicited from Detective Matlock during defense counsel's cross-examination, our review of the record indicates that defense counsel merely asked Detective Matlock whether Hunter had told him that Harris had "poked" a knife at her and whether that would explain the laceration on her knee. Counsel did not elicit any testimony from Detective Matlock regarding Harris' character. Accordingly, the prosecutor's questions to Ms. Harris were improper and the trial court should have sustained defense counsel's objections to them.
 {¶ 70} Nevertheless, in light of the other significant evidence against Hunter, we cannot conclude that this error was an outcome determinative defect in the proceedings and, therefore, find it to be harmless error.
 {¶ 71} Appellant's third assignment of error is overruled.
 SENTENCING {¶ 72} At the sentencing hearing on January 25, 2005, the trial judge stated:
 {¶ 73} "[T]he court is required to impose a prison sentence in this case from 15 years to life. And in accordance with Section 2929.14(B), finds that the shortest term authorized for the offense would apply in this case * * *. It is, therefore, ordered that the defendant shall serve a stated term of 15 years in prison on the merged offenses of murder and felonious assault."
 {¶ 74} Consistent with its sentence, the trial court entered a journal entry imposing a prison sentence of 15 years. Although the court did not mention post release during the sentencing hearing, in its journal entry, the trial court stated, "post release control is part of this prison sentence for the maximum time allowed for the above felony(s) under R.C. 2967.28."
 {¶ 75} Subsequently, the trial court entered a journal entry which purported to correct the sentencing entry. It stated, in its entirety, "Nunc pro tunc entry as of and for January 25, 2005. The court imposes a prison sentence at the Ohio Reformatory for Women of 15 years to life."
 {¶ 76} In her seventh assignment of error, Hunter argues that she was not present at the "resentencing," in violation of Crim.R. 43(A), when the trial court entered its nunc pro tunc order changing her sentence. In her eighth assignment of error, she contends that postrelease control was not properly imposed because the trial court failed to advise her of postrelease control during the sentencing hearing but then purported to impose postrelease control in its sentencing journal entry.
 {¶ 77} In light of the several errors relating to Hunter's sentencing, we vacate Hunter's sentence and remand for resentencing. First, it is apparent that by sentencing Hunter to 15 years incarceration, the trial court did not impose a valid sentence. Pursuant to R.C. 2929.02, "whoever is convicted of or pleads guilty to murder in violation of section 2903.02 of the Revised Code shall be imprisoned for an indefinite term of 15 years to life * * *." Accordingly, the judge erred in sentencing Hunter to a stated term of 15 years incarceration.
 {¶ 78} The trial court erred yet again in entering its subsequent nunc pro tunc entry sentencing Hunter to 15 years to life in prison. In Associated Estates Corp. v. Cleveland (Aug. 5, 1999), Cuyahoga App. No. 75958, we stated:
 {¶ 79} "The purpose of a nunc pro tunc order is to have the judgment of the court reflect its true action so that the record speaks the truth. A nunc pro tunc order literally means `now for then.' A trial court may exercise its nunc pro tunc authority in limited situations to correct clerical errors. A nunc pro tunc order may not be used to show what the court might or should have decided, or intended to decide, but what it actually did decide. Such an order is limited to memorializing what the trial court actually did at an earlier point in time. A court may not use a nunc pro tunc entry to enter of record that which it intended or might have made but what in fact was not made." (Citations omitted).
 {¶ 80} The trial court's nunc pro tunc entry did not correct any clerical error. It is apparent that, at sentencing, the trial court (incorrectly) intended to sentence Hunter to a stated term of 15 years incarceration, not an indefinite term of 15 years to life. Thus, the trial court's nunc pro tunc entry sentencing her to 15 years to life in prison attempted to enter of record an order that was never made. As discussed in the well-reasoned dissent in State v. Ferrell, Cuyahoga App. No. 85821,2005-Ohio-5992, a nunc pro tunc order cannot be used for this purpose.[1]
 {¶ 81} With respect to postrelease control, the State concedes that the trial court erred in failing to notify Hunter at the sentencing hearing of any postrelease control.
 {¶ 82} Hunter's sentence is vacated and the matter is remanded to the trial court for resentencing.
 {¶ 83} Appellant's seventh and eighth assignments of error are sustained.
Conviction affirmed; sentence vacated; remanded for resentencing.
This cause is remanded for further proceedings consistent with the opinion herein.
It is, therefore, ordered that the parties share equally the costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, P.J., and Karpinski, J., concur.
[1] We are troubled by the prosecutor's misrepresentation that, at the sentencing hearing, the trial court imposed an indefinite sentence of 15 years to life in prison and that the nunc pro tunc entry "merely reflects what the trial court stated at the sentencing hearing." The prosecutor quotes to us the trial court's statement that "the court is required to impose a prison sentence in this case from 15 years to life," but then ignores the statement only one sentence later that, "it is, therefore, ordered that the defendant shall serve a stated term of 15 years in prison * * *."