[Cite as *State v. Smith*, 2025-Ohio-3071.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                     No. 114637

    v.                                      :

STEPHEN SMITH,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 28, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-694308-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Michael V. Wilhelm, Assistant Public Defender, *for appellant*.

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant Stephen Smith ("Smith") appeals his convictions for felonious assault and having weapons while under disability

rendered after a bench trial and argues the convictions were based upon insufficient evidence and were against the manifest weight of the evidence. For the following reasons, we affirm the convictions.

## I. Factual and Procedural History

{¶ 2} This case arose from Smith's alleged involvement with the shooting and subsequent death of Justice Jackson ("Jackson") on November 5, 2022. The events of the evening were relayed by witness trial testimony and depicted in a video recording captured by a business located near where the events occurred.

## A. The Shooting

{¶ 3} On the night of November 5, 2022, Jackson, his girlfriend Jasmine Campbell ("Campbell"), Delaun Washington ("Washington"), and Travon Smith ("Travon") ( collectively "Jackson's party") met at the House Ultra Lounge ("Ultra Lounge") in Euclid, Ohio to celebrate Jackson's birthday. Other patrons at the Ultra Lounge included a group of approximately 20 people driven to the bar in Smith's party bus ("the party bus group"), including Smith, Carisma Warren ("Warren") who is Smith's sister, and Christina Roberts ("Roberts"). A verbal argument occurred inside the Ultra Lounge between members of the party bus group and Jackson, resulting in both parties having to leave the premises.

{¶ 4} Jackson's party and the party bus group met again as both groups dispersed to the open parking lot situated in the rear of the Ultra Lounge, and a physical fight ensued. During the fight, Jackson retrieved a firearm from Travon's vehicle and fired gunshots near or at party bus members congregated close to the

party bus. In reaction to the gunshots, the party bus group hurried to board the bus. Roberts sustained bullet injuries to her leg and ankles while waiting to enter the party bus.

{¶ 5} After Jackson discharged his firearm, he and Travon ran to Travon's parked vehicle, and Washington ran to his vehicle parked next to Travon's car. Campbell did not leave the premises with these three individuals. Travon's car — followed by Washington's vehicle — exited the parking lot and turned left, driving towards Lake Shore Blvd. and away from the party bus parked on the edge of the parking lot. As the two vehicles left the parking lot, Smith stood next to the door of the party bus. The video shown at trial, which was grainy, shows Smith raised his right arm and aimed or pointed in the direction of the departing vehicles. The State alleged that Smith possessed and discharged a firearm — likely a revolver that did not automatically expel shell casings upon discharge — when he pointed at the retreating vehicles. Within seconds of Smith raising his arm, an unidentified male exited the party bus discharging a semiautomatic firearm in the direction of Travon's and Washington's cars.

{¶ 6} While driving away from the Ultra Lounge as a passenger in Travon's vehicle, Jackson was struck in the head by a bullet. Travon drove Jackson to the Euclid General Hospital, with Washington following in his own vehicle. Jackson died due to a single gunshot wound to his head.

**B. Police Investigation**

{¶ 7} Euclid police officers Joshua Gebler ("Officer Gebler"), Ronald Goodheart ("Officer Goodheart"), and Corey Rose ("Officer Rose") arrived at the Ultra Lounge around 2:30 a.m. in response to phone calls that shots had been fired on the premises. No individual from Jackson's group or the party bus members was present when the police arrived at the crime scene.

{¶ 8} Officer Gebler observed shell casings strewn around the parking lot and a spot of blood about the size of a baseball in a parking space. Officers placed placards to mark the location of the shell casings and blood. Officer Gebler testified that the positioning of the shell casings could have been disturbed prior to his arrival by wind, people running in the area, or vehicles driving nearby. Officer Gebler also stated that the recovered shell casings came from a semiautomatic weapon rather than a revolver.

{¶ 9} Officer Goodheart observed a window broken due to a gunshot at the Marc's grocery store that shared the parking lot with the Ultra Lounge. Officer Rose spoke with a security guard and photographed the scene. Officer Rose also testified to the windy conditions on the night of the shooting.

{¶ 10} Officers Gebler and Goodheart drove from the crime scene to Euclid General Hospital where they spoke with Campbell, Travon, and Washington. The officers took Travon, who had blood on his shoes and clothing and matched the description of the unidentified shooter, into custody and administered a gunshot

residue kit. The police subsequently released Travon, and filed no charges against him.

{¶ 11} Roberts was treated for her gunshot wounds at South Pointe Hospital. The day after the shooting, Officers Gebler and Goodheart retrieved from South Pointe Hospital a bullet fragment removed from Roberts's body as well as her clothing.

{¶ 12} Detective Anthony Malone ("Detective Malone") with the Euclid Police Department also investigated Jackson's shooting. With Travon's permission, Detective Malone inspected Travon's vehicle and observed a single bullet hole in the driver's side opera window plus large amounts of blood on the passenger seat and armrest. The police searched inside Travon's vehicle for the firearm discharged by Jackson at the Ultra Lounge parking lot, but no gun was found.

{¶ 13} Detective Malone testified that officers at the crime scene collected .40-caliber shell casings from the Ultra Lounge parking lot in the vicinity where the party bus was parked; no 9 mm shell casings were recovered. Detective Malone further stated that revolvers which discharge 9 mm shell casings do not automatically eject shell casings. Detective Malone testified that he could not identify the type of firearms discharged by Jackson or allegedly discharged by Smith.

{¶ 14} During his investigation, Detective Malone obtained video footage from Marc's grocery store, a hair salon, and a bank — all three businesses bordered the parking lot where the shooting occurred. Detective Malone testified that the hair salon employees feared retaliation and, therefore, were uncooperative and would

not provide the original video recording that captured the shooting. An unidentified representative of the hair salon allowed Detective Malone to use the detective's own mobile phone to record the salon's video recording. Detective Malone conceded that his copy of the video recording was grainy. Detective Malone also testified that while the hair salon representative determined what portions of the video he could view, he did not find that act impeded his investigation. Detective Malone stated that the security guards present at the time of the shooting and the party bus group were uncooperative in aiding his investigation.

{¶ 15} The only video recording shown during police interviews and at trial was retrieved from the hair salon. The video recording showed Jackson's group and the party bus group fighting in the Ultra Lounge parking lot; Jackson retrieving a firearm from Travon's vehicle and discharging the firearm; the party bus members rushing to enter the party bus; and a gunshot that appeared to be discharged from inside the party bus. The video further shows Smith, alone, standing outside the party bus as Travon's and Washington's vehicles left the parking lot; Smith raising his right hand and pointing at the departing vehicles; and almost simultaneously an unidentified male exiting the party bus and discharging a semiautomatic weapon at the departing vehicles. After the unidentified male stopped shooting, Smith appears to pick up an object from the ground and enter the party bus. Smith never ducked or reacted when gunshots were discharged by Jackson or the unidentified male shooter.

{¶ 16} As part of his investigation, Detective Malone interviewed Smith on December 13, 2022. Smith stated that a friend of his sister booked the party bus for the evening of November 5, 2022, and the party bus stopped at a few bars before arriving at the Ultra Lounge. Smith recalled hearing gunshots while members of the party bus group moved towards the bus and a member of the party bus group was hit by a bullet. Smith denied that he possessed or discharged a firearm while at the Ultra Lounge and stated he ducked when he heard gunshots and immediately entered the party bus. Detective Malone played for Smith the video he had obtained from the night of the shooting. Upon viewing that video, Smith continued to deny he possessed or discharged a firearm at Travon's vehicle and stated the video did not demonstrate a spark from his hand representing the discharge of a firearm.

{¶ 17} Detective Malone also interviewed Campbell who identified Smith as the owner of the party bus and as an individual present at the time of the shooting. Detective Malone reviewed Instagram accounts and identified Warren — Smith's sister — as part of the party bus group. According to Detective Malone, Warren refused to participate in an interview at the police department, but reviewed, via her mobile phone, the video secured by the hair salon and identified Smith in the video.

{¶ 18} The police eventually issued an arrest warrant for Smith and search warrants for Smith's truck and the home of his girlfriend. U.S. Marshals apprehended Smith; discovered illegal drugs in Smith's truck; and retrieved a firearm from Smith's girlfriend's home that was determined to not have been involved in Jackson's shooting.

{¶ 19} On August 13, 2024, a Cuyahoga County Grand Jury issued a 14-count indictment against Smith for the alleged felonious assault and murder of Jackson; the alleged felonious assault of Robinson; and the alleged possession and trafficking of heroin, cocaine, and/or a fentanyl-related compound.  On August 16, 2024, Smith pleaded not guilty to the charges.  Smith executed a waiver of his right to a jury trial on October 16, 2024, and the case proceeded to a bench trial.

## C. Trial Testimony

### 1. Police Department

{¶ 20} Officers Gebler, Goodheart, Rose, and Detective Malone testified at trial consistently with the facts stated above.  Smith's police interview was played for the trial judge.

### 2. Jackson's Group

{¶ 21} At trial, Travon, Washington, and Campbell provided testimony in agreement with the above facts.  Washington also denied that Jackson regularly carried a firearm.  Washington testified that he heard gunshots fired as he drove away from the Ultra Lounge parking lot and a single bullet struck his car on the passenger side.  Travon further testified that he was not initially honest with the police because he had been drinking and driving and he did not want to get in trouble for those actions.  Travon testified that he did not know what happened to Jackson's gun after Jackson discharged gunshots in the Ultra Lounge parking lot.  Neither Travon nor Washington identified Jackson's alleged shooter.

{¶ 22} Campbell testified that she was involved with the fight in the Ultra Lounge parking lot. Smith allegedly informed Campbell that the party bus group jumped her "because [Jackson] hit a girl." Tr. 341. Campbell also testified about her police interview with Detective Malone on November 11, 2022. Initially, Campbell believed there was one shooter — the unidentified male who exited the party bus and discharged a semiautomatic firearm as Travon's and Washington's vehicles left the Ultra Lounge parking lot. However, after Campbell identified that individual as the sole shooter during her police interview, Detective Malone played Campbell the hair salon's video recording from that night and pointed out how, in his belief, Smith also discharged a firearm towards Travon's and Washington's departing vehicles. Following her police interview and viewing of the video recording, Campbell participated in a photo array presented by an independent police officer and identified Smith as Jackson's shooter.

### 3. Party Bus Members

{¶ 23} Warren — Smith's sister — and Roberts were on the party bus the night of the shooting. At trial, Warren was unable to recall any relevant details related to the shooting. Warren also could not identify Smith in the video recording played at trial and did not recall informing Detective Malone over the telephone that the individual in the video was Smith. Roberts was unable to provide the name of any individual who was on the party bus, and she testified that she did not know the identity of the individual who shot her.

### 4. Dr. Alison Krywanczyk ("Dr. Krywanczyk")

{¶ 24} The parties recognized Dr. Krywanczyk as an expert in the area of forensic pathology. Dr. Krywanczyk testified pursuant to her position as the deputy medical examiner with the Cuyahoga County Medical Examiner's Office and her completion of Jackson's autopsy. Dr. Krywanczyk ruled Jackson's death a homicide caused by a single gunshot wound to the head.

**5. Dr. Jonathan Gardner ("Dr. Gardner")**

{¶ 25} Dr. Gardner, an expert in firearm and tool analysis with the Ohio Bureau of Investigation, testified that in conjunction with the death of Jackson he examined (1) a Smith and Wesson .40-caliber pistol with magazine and cartridges, (2) 15 fired cartridges collected from the crime scene, and (3) five fired projectiles or bullet fragments. The pistol was obtained from Smith's girlfriend's house pursuant to a search warrant. Dr. Gardner stated that the 15 cartridges were fired by the same firearm, but the provided Smith and Wesson firearm was excluded as the source of those cartridges. No other firearm was presented by the State.

{¶ 26} The five bullet fragments submitted for testing included (1) two intact .40-caliber fired bullets — retrieved from Jackson's skull and the Marc's grocery store — that could have been discharged from the same firearm but the testing was inconclusive, (2) two .38-caliber bullet fragments — one of which was retrieved from Roberts's leg; and (3) a small lead fragment that was unsuitable for analysis or comparison that was retrieved from the Marc's grocery store. Gardner stated that the tests were inconclusive whether the bullet fragment removed from Jackson's body matched the other .40-caliber cartridges recovered from the crime scene.

{¶ 27} Dr. Gardner stated that the .38-caliber bullet fragments were fired from a different firearm than the recovered .40-caliber bullets, and it was inconclusive whether the two fragments were fired from the same firearm. Dr. Gardner testified that the .38-caliber bullet fragments were significantly damaged, which prevented him from identifying with certainty the type of firearm that discharged the bullets but the bullets could have been discharged by a revolver. Dr. Gardner testified that revolvers do not automatically expel cartridge casings at the time the firearm is discharged whereas a semiautomatic pistol automatically ejects cartridge cases. Dr. Gardner further stated that "very often when we see cartridge cases at an incident, they're from semiautomatic firearms or fully automatic firearms, because they've been automatically ejected out." Tr. 415-416.

**6. Tom Ciula ("Ciula")**

{¶ 28} Tom Ciula testified that he completes forensic video and audio work for his company, TC Productions, and he was previously employed by the Cleveland Division of Police for 13 years in charge of the audio and video forensic department.

{¶ 29} In the instant case, Ciula verified the video recording obtained by Detective Morgan from the hair salon was a true and accurate representation of the events at the Ultra Lounge on November 5, 2022, with no manipulations to the video. Ciula also created two enlargement videos that followed the actions of Jackson and Smith, respectively; created annotated frames that stopped the video and pointed out an individual or motion; and created stills or individual frames from the video. Ciula described why he obtained stills:

All video is nothing more than a series of single images displayed one after another. It is often helpful to take that video, reduce it to those stills, throw away the stills that were there before or after, the ones you don't need, but coming up on the stills that cover the area of interest so you can see, one at a time, going backward or forward what occurred, because sometimes in a video the video's moving really far too fast to be able to clearly see what's happening. It happens in muzzle flashes for instance. Muzzle flash will last a frame and if you're looking at it full speed you might miss it. But you can go back and forth and say there's no flash here, oh, but in this frame there is and the next there isn't. Things of that nature. It makes it easier to understand the video at times.

Tr. 591-592.

{¶ 30} At trial, the State played Ciula's enlargement videos and annotated frames and provided his still pictures. Ciula testified that his still pictures showed a visible object — a firearm — extending from Smith's hand as well as a muzzle flash at the end of Smith's weapon that showed he discharged his weapon. Ciula testified that the videos and still pictures do not demonstrate any recoil from Smith's arm at the time he allegedly discharged a firearm. Ciula described the videos and pictures and stated that while Travon's and Washington's vehicles left the parking lot, Smith extended his arm towards the vehicles and discharged a firearm. Ciula testified that the videotape depicts "a muzzle flash that, because of the angle and because of what we are seeing, could only emanate from Mr. Smith's gun." Tr. 610-611. Ciula also stated it is probable Smith fired a second shot at Travon's and Washington's retreating vehicles but he could not state with absolute scientific certainty that the second shot occurred. Ciula's report, videos, and stills were admitted into evidence without any objection.

**D. Verdict and Sentencing**

{¶ 31} At the conclusion of the State's case, defense counsel made a Crim.R. 29 motion, that the trial court denied. Following the admission of exhibits, defense counsel made a renewed motion for acquittal that was also denied.

{¶ 32} The trial court found Smith not guilty of Counts 1 and 2, murder; not guilty of Counts 3, 5, and 6, felonious assault of Roberts; and not guilty of Counts 9, 11, and 13, trafficking. The trial court found Smith guilty of Count 4, felonious assault of Jackson in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications; guilty of Count 7, having weapons while under disability in violation of R.C. 2923.13(A)(2); guilty of Count 8, having weapons while under disability in violation of R.C. 2923.13(A)(3); and guilty of Counts 10, 12, and 14, drug possession in violation of R.C. 2925.11(A).

{¶ 33} On November 12, 2024, the trial court sentenced Smith on Count 4 to three years on the gun specification to be served prior to and consecutive to a minimum prison term of three years and a maximum prison term of four years, six months on the underlying offense of felonious assault. The trial court also sentenced Smith to 24 months each on Counts 7, 8, and 14 and three years each on Counts 10 and 12, all to be served concurrently with the sentence imposed under Count 4, for an aggregate sentence of six to seven and a half years.

{¶ 34} On December 6, 2024, Smith filed a timely notice of appeal presenting four assignments of error:

Assignment of Error I.  Appellant's conviction for felonious assault is based on insufficient evidence thereby denying his right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution.

Assignment of Error II.  Appellant's convictions for Having Weapons Under Disability are based on insufficient evidence thereby denying his right to Due Process under the Fifth and Fourteenth Amendment of the United States Constitution.

Assignment of Error III.  The trial court erred in entering a conviction for felonious assault, as that conviction was against the manifest weight of the evidence, in derogation of Defendant's right to Due Process under the Fifth and Fourteenth Amendments of the United States Constitution.

Assignment of Error IV.  The trial court erred in entering a conviction for Having Weapons Under Disability, as that conviction was against the manifest weight of the evidence, in derogation of Defendant's right to Due Process under the Fifth and Fourteenth Amendments of the United States Constitution.

Smith does not appeal the court's convictions and sentencing on Counts 10, 12, and 14 for drug possession.

## II. Legal Analysis

## A. Sufficiency of the Evidence

{¶ 35} The trial court determined Smith knowingly caused or attempted to cause harm to Jackson with a firearm while under disability and, thus, found Smith guilty of felonious assault under R.C. 2903.11(A)(2) and having weapons while under disability pursuant to R.C. 2923.13(A)(2).  In his first and second assignments of error, Smith argues there was insufficient evidence to find him guilty of felonious assault and having weapons while under disability.  Specifically, Smith argues the State failed to introduce ballistic evidence to establish that he discharged a firearm;

the State failed to introduce eyewitness testimony that indicated he discharged a firearm at Jackson; and the video recording did not establish he discharged a firearm at Jackson.

{¶ 36} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the State has met its burden of production at trial is conducted. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 33. An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at ¶ 36. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at ¶ 23.

**1. Felonious Assault**

{¶ 37} To prove felonious assault in violation of R.C. 2903.11(A)(2), the State had to prove beyond a reasonable doubt that Smith knowingly "cause[d] or attempt[ed] to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance."

{¶ 38} The video tape introduced at trial was undeniably grainy. However, the video tape depicted Smith, standing just outside the door to the party bus, raising his right arm to shoulder height and pointing or aiming in the direction of Travon's and Washington's vehicles as they exited the parking lot. Almost simultaneously with the alleged gun shot fired by Smith, an unidentified male stepped off the party bus discharging a semiautomatic weapon in the same direction that Smith pointed his alleged firearm. Smith did not testify at trial.

{¶ 39} In addition to viewing the video recording, the trial court heard the testimony of Ciula. Ciula testified that he worked for 13 years in the audio and video forensic department of the Cleveland Division of Police and he now operates his own business in that industry. Ciula stated he reviewed the video recording from the night of Jackson's shooting, and created enhancements, annotated frames, and still pictures to better depict the events of that evening and, specifically, to interpret Smith's actions.

{¶ 40} Ciula further testified that the video recording showed Smith holding a firearm in his extended hand and a muzzle flash at the end of the firearm that indicated the gun was discharged towards Travon's and Washington's vehicles at least once and maybe twice:

> ASSISTANT PROSECUTING ATTORNEY: What are we seeing here?
>
> CIULA: At this stage we are seeing Mr. Jackson and his friend pulling away from the area. Mr. Smith with his arm extended toward the vehicle that Mr. Jackson is in.
>
> (Video played in open court.)

ASSISTANT PROSECUTING ATTORNEY:  What do we see now?

CIULA:  That was a weapon fired from behind Mr. Smith.  The puff of smoke is coming out from behind his head so we can tell at this stage he is not the one who is firing.

ASSISTANT PROSECUTING ATTORNEY:  Okay.

 (Video played in open court.)

CIULA:  Again, this is a muzzle flash that occurs behind Mr. Smith's extended arm so that is a shot from a different individual.

ASSISTANT PROSECUTING ATTORNEY:  Okay.

 (Video played in open court.)

CIULA:  At this point the small dot as seen here is a muzzle flash that, because of the angle and because of what we are seeing, could only emanate from Mr. Smith's gun.

ASSISTANT PROSECUTING ATTORNEY:  So Mr. Smith fires as well?

CIULA:  Correct.

 (Video played in open court.)

CIULA:  Now, I will back that section up.  After that first muzzle flash from Mr. Smith there is, here, a second muzzle flash that is probably from Mr. Smith's gun, but because you have another individual moving forward I cannot say with absolute scientific certainty which weapon this muzzle flash comes from.  It is probable, because of the positioning, that that muzzle flash is rising from the gun that would be held by Mr. Smith.

Tr. 609-611.

{¶ 41} The video recording and Ciula's testimony supported the allegation that Smith caused or attempted to cause physical harm to Jackson with a firearm and, in turn, supported Smith's felonious-assault conviction.  Despite Smith's

arguments, the evidence presented was sufficient to establish the elements of this offense, and additional eyewitness or ballistic testimony was not necessary.

## 2. Having Weapons While Under Disability

{¶ 42} To prove the elements of having weapons while under disability in violation of R.C. 2923.13(A)(2), the State must prove that

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

. . .

(2) The person is under indictment for or has been convicted of any felony offense of violence. . . .

{¶ 43} Smith was previously convicted of domestic violence, a felony of the fourth degree, on September 26, 2019. *See* Cuyahoga C.P. No. CR-18-631886-A. Accordingly, when the trial court found Smith used a firearm to attempt to inflict serious harm on Jackson, the evidence also supported the conviction of having weapons while under disability.

{¶ 44} After viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of felonious assault and having weapons under disability proven beyond a reasonable doubt. Accordingly, Smith's first and second assignments of error are overruled.

## B. Manifest Weight of the Evidence

{¶ 45} In his third and fourth assignments of error, Smith contends that the trial court's convictions for felonious assault and having weapons while under

disability are against the manifest weight of the evidence. Smith reiterates his arguments that the absence of eyewitness testimony and a firearm associated with the shooting as well as a fuzzy video recording do not show beyond a reasonable doubt that Smith possessed and discharged a gun on November 5, 2022.

{¶ 46} A manifest weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52 at ¶ 24; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at ¶ 33. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at ¶ 25, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*.

{¶ 47} In viewing the evidence presented at trial, the credibility of Campbell's eyewitness testimony was in question. During her police interview,

Campbell — Jackson's girlfriend — initially named the unidentified male who stepped off the party bus as the sole shooter. It was only after Detective Malone suggested shots were also fired by Smith and he showed her the video recording from the night of the shooting did Campbell identify Smith as the shooter and select his photograph from a photo array. Other witnesses present at the shooting — Travon, Washington, Warren, and Robinson — were unable to identify Smith as a shooter.

{¶ 48} Similarly, the State failed to introduce definitive ballistic evidence. The ballistic evidence showed that at least two firearms were discharged at the crime scene — a .40-caliber weapon and a .38-caliber weapon. Officer Gebler testified that the 15 cartridge casings recovered from the crime scene were discharged by a semiautomatic weapon. The inference was that the 15 cartridge casings, which originated from a single .40-caliber firearm, were discharged when the unidentified male exited the party bus and fired a semiautomatic weapon at Travon's and Washington's departing vehicles. The medical examiner recovered a .40-caliber bullet from Jackson's head, but the tests were inconclusive as to whether that bullet was discharged from the same firearm that discharged the 15 shell casings recovered at the Ultra Lounge parking lot. The firearms allegedly discharged by Jackson and Smith were not recovered by the police.

{¶ 49} While Ciula testified that Smith discharged only one, or maybe two, bullets, the video recording showed several shots were also fired by Jackson in the parking lot. Yet only two.38-caliber bullet fragments were recovered from the crime

scene. To address the absence of additional cartridge casings, Officer Gebler testified high winds on the night of the shooting, foot traffic, or vehicular traffic could have disturbed the location of shell casings before the police secured the crime scene. Officer Rose also stated high winds made it difficult for the placards officers placed by the shell casings to stay in place but the video recording did not reflect high winds. Additionally, Dr. Gardner testified that .38-caliber bullets are often fired from revolvers and the discharge of revolvers does not result in the automatic ejection of cartridge casings.

{¶ 50} A review of the record shows that uncontradicted trial testimony confirmed shots were fired by Jackson and the unidentified male who exited the party bus. Campbell testified that Smith also discharged a firearm although she initially told Detective Malone during her police interview that the unidentified male was the sole shooter. No firearms allegedly discharged in the Ultra Lounge parking lot were recovered. Thus, the ballistic evidence and eyewitness testimony did not substantiate the allegation that Smith possessed and discharged a weapon at the departing vehicles nor did they demonstrate Smith did not possess and discharge a weapon.

{¶ 51} However, as stated above in the sufficiency-of-the-evidence analysis, the State introduced evidence — the video recording and Ciula's testimony — demonstrating that Smith held a firearm and discharged it, at least once, in the direction of Travon's car in which Jackson was a passenger. Defense counsel attempted to discredit Ciula when he inquired whether a specific still photo and

coordinating portion of the video recording showed a vehicle's headlight reflected at the end of Smith's raised arm rather than a muzzle flash but Ciula testified the light was not associated with a headlight.

{¶ 52} The trier of fact is allowed to believe all, some, or none of the evidence presented at trial. *Garfield Hts. v. Poree*, 2025-Ohio-1065, ¶ 8 (8th Dist.), citing *State v. Smith*, 2010-Ohio-4006, ¶ 16 (8th Dist.). Further, ""a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state."" *Poree* at ¶ 8, quoting *State v. Jallah*, 2015-Ohio-1950, ¶ 71 (8th Dist.), quoting *State v. Hall*, 2014-Ohio-2959, ¶ 28 (4th Dist.).

{¶ 53} After reviewing the record in this case, we cannot say this is an "exceptional case" where the trial court clearly lost its way and created such a manifest miscarriage of justice that Smith's convictions were against the manifest weight of the evidence. *Thompkins,* 1997-Ohio-52 at ¶ 25. For the foregoing reasons, Smith's third and fourth assignments of error are without merit and are overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
WILLIAM A. KLATT, JUDGE*

EILEEN A. GALLAGHER, A.J., and
SEAN C. GALLAGHER, J., CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court
of Appeals.)